# ARIZONA *v.* FULMINANTE

No. 89–839.   Argued October 10, 1990—Decided March 26, 1991

WHITE, J., delivered an opinion, Parts I, II, and IV of which are for the Court, and filed a dissenting opinion in Part III.  MARSHALL, BLACKMUN, and STEVENS, JJ., joined Parts I, II, III, and IV of that opinion; SCALIA, J., joined Parts I and II; and KENNEDY, J., joined Parts I and IV.  REHN-QUIST, C. J., delivered an opinion, Part II of which is for the Court, and filed a dissenting opinion in Parts I and III, *post*, p. 302.  O'CONNOR, J., joined Parts I, II, and III of that opinion; KENNEDY and SOUTER, JJ., joined Parts I and II; and SCALIA, J., joined Parts II and III.  KENNEDY, J., filed an opinion concurring in the judgment, *post*, p. 313.

*Barbara M. Jarrett,* Senior Assistant Attorney General of Arizona, argued the cause for petitioner.  With her on the briefs were *Robert K. Corbin,* Attorney General, and *Jessica Gifford Funkhouser.*

*Paul J. Larkin, Jr.,* argued the cause for the United States as *amicus curiae* urging reversal.  With him on the brief were *Solicitor General Starr, Assistant Attorney General Dennis, Deputy Solicitor General Bryson,* and *Joel M. Gershowitz.*

*Stephen R. Collins,* by appointment of the Court, 495 U. S. 902, argued the cause and filed a brief for respondent.*

---

*\*Gregory U. Evans, Daniel B. Hales, Joseph A. Morris, George D. Webster, Jack E. Yelverton, Fred E. Inbau, Wayne W. Schmidt, Bernard J. Farber,* and *James P. Manak* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging reversal.

*H. Gerald Beaver* and *Richard B. Glazier* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

JUSTICE WHITE delivered an opinion, Parts I, II, and IV of which are the opinion of the Court, and Part III of which is a dissenting opinion.†

The Arizona Supreme Court ruled in this case that respondent Oreste Fulminante's confession, received in evidence at his trial for murder, had been coerced and that its use against him was barred by the Fifth and Fourteenth Amendments to the United States Constitution. The court also held that the harmless-error rule could not be used to save the conviction. We affirm the judgment of the Arizona court, although for different reasons than those upon which that court relied.

I

Early in the morning of September 14, 1982, Fulminante called the Mesa, Arizona, Police Department to report that his 11-year-old stepdaughter, Jeneane Michelle Hunt, was missing. He had been caring for Jeneane while his wife, Jeneane's mother, was in the hospital. Two days later, Jeneane's body was found in the desert east of Mesa. She had been shot twice in the head at close range with a large caliber weapon, and a ligature was around her neck. Because of the decomposed condition of the body, it was impossible to tell whether she had been sexually assaulted.

Fulminante's statements to police concerning Jeneane's disappearance and his relationship with her contained a number of inconsistencies, and he became a suspect in her killing. When no charges were filed against him, Fulminante left Arizona for New Jersey. Fulminante was later convicted in New Jersey on federal charges of possession of a firearm by a felon.

Fulminante was incarcerated in the Ray Brook Federal Correctional Institution in New York. There he became

---

†JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join this opinion in its entirety; JUSTICE SCALIA joins Parts I and II; and JUSTICE KENNEDY joins Parts I and IV.

friends with another inmate, Anthony Sarivola, then serving a 60-day sentence for extortion. The two men came to spend several hours a day together. Sarivola, a former police officer, had been involved in loansharking for organized crime but then became a paid informant for the Federal Bureau of Investigation. While at Ray Brook, he masqueraded as an organized crime figure. After becoming friends with Fulminante, Sarivola heard a rumor that Fulminante was suspected of killing a child in Arizona. Sarivola then raised the subject with Fulminante in several conversations, but Fulminante repeatedly denied any involvement in Jeneane's death. During one conversation, he told Sarivola that Jeneane had been killed by bikers looking for drugs; on another occasion, he said he did not know what had happened. Sarivola passed this information on to an agent of the Federal Bureau of Investigation, who instructed Sarivola to find out more.

Sarivola learned more one evening in October 1983, as he and Fulminante walked together around the prison track. Sarivola said that he knew Fulminante was "starting to get some tough treatment and whatnot" from other inmates because of the rumor. App. 83. Sarivola offered to protect Fulminante from his fellow inmates, but told him, "'You have to tell me about it,' you know. I mean, in other words, 'For me to give you any help.'" *Ibid.* Fulminante then admitted to Sarivola that he had driven Jeneane to the desert on his motorcycle, where he choked her, sexually assaulted her, and made her beg for her life, before shooting her twice in the head. *Id.*, at 84–85.

Sarivola was released from prison in November 1983. Fulminante was released the following May, only to be arrested the next month for another weapons violation. On September 4, 1984, Fulminante was indicted in Arizona for the first-degree murder of Jeneane.

Prior to trial, Fulminante moved to suppress the statement he had given Sarivola in prison, as well as a second confes-

sion he had given to Donna Sarivola, then Anthony Sarivola's fiancée and later his wife, following his May 1984 release from prison. He asserted that the confession to Sarivola was coerced, and that the second confession was the "fruit" of the first. *Id.*, at 6–8. Following the hearing, the trial court denied the motion to suppress, specifically finding that, based on the stipulated facts, the confessions were voluntary. *Id.*, at 44, 63. The State introduced both confessions as evidence at trial, and on December 19, 1985, Fulminante was convicted of Jeneane's murder. He was subsequently sentenced to death.

Fulminante appealed, arguing, among other things, that his confession to Sarivola was the product of coercion and that its admission at trial violated his rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution. After considering the evidence at trial as well as the stipulated facts before the trial court on the motion to suppress, the Arizona Supreme Court held that the confession was coerced, but initially determined that the admission of the confession at trial was harmless error, because of the overwhelming nature of the evidence against Fulminante. 161 Ariz. 237, 778 P. 2d 602 (1988). Upon Fulminante's motion for reconsideration, however, the court ruled that this Court's precedent precluded the use of the harmless-error analysis in the case of a coerced confession. *Id.*, at 262, 778 P. 2d, at 627. The court therefore reversed the conviction and ordered that Fulminante be retried without the use of the confession to Sarivola.[1] Because of dif-

---

[1] In its initial opinion, the Arizona Supreme Court had determined that the second confession, to Donna Sarivola, was not the "fruit of the poisonous tree," because it was made six months after the confession to Sarivola; it occurred after Fulminante's need for protection from Sarivola presumably had ended; and it took place in the course of a casual conversation with someone who was not an agent of the State. 161 Ariz. 237, 246, 778 P. 2d 602, 611 (1988). The court adhered to this determination in its supplemental opinion. *Id.*, at 262, 778 P. 2d, at 627. This aspect of the Arizona Supreme Court's decision is not challenged here.

fering views in the state and federal courts over whether
the admission at trial of a coerced confession is subject to
a harmless-error analysis, we granted the State's petition
for certiorari, 494 U. S. 1055 (1990). Although a majority
of this Court finds that such a confession is subject to a
harmless-error analysis, for the reasons set forth below, we
affirm the judgment of the Arizona court.

## II

We deal first with the State's contention that the court
below erred in holding Fulminante's confession to have been
coerced. The State argues that it is the totality of the cir-
cumstances that determines whether Fulminante's confession
was coerced, cf. *Schneckloth* v. *Bustamonte,* 412 U. S. 218,
226 (1973), but contends that rather than apply this stand-
ard, the Arizona court applied a "but for" test, under which
the court found that but for the promise given by Sarivola,
Fulminante would not have confessed. Brief for Petitioner
14–15. In support of this argument, the State points to the
Arizona court's reference to *Bram* v. *United States,* 168
U. S. 532 (1897). Although the Court noted in *Bram* that a
confession cannot be obtained by "'any direct or implied
promises, however slight, nor by the exertion of any im-
proper influence,'" *id.,* at 542–543 (quoting 3 H. Smith & A.
Keep, Russell on Crimes and Misdemeanors 478 (6th ed.
1896)), it is clear that this passage from *Bram,* which under
current precedent does not state the standard for determin-
ing the voluntariness of a confession, was not relied on by the
Arizona court in reaching its conclusion. Rather, the court
cited this language as part of a longer quotation from an Ari-
zona case which accurately described the State's burden of
proof for establishing voluntariness. See 161 Ariz., at 244,
778 P. 2d, at 609 (citing *State* v. *Thomas,* 148 Ariz. 225, 227,
714 P. 2d 395, 397 (1986); *Malloy* v. *Hogan,* 378 U. S. 1,
7 (1964); and *Bram, supra,* at 542–543). Indeed, the Ari-
zona Supreme Court stated that a "determination regarding

the voluntariness of a confession . . . must be viewed in a totality of the circumstances," 161 Ariz., at 243, 778 P. 2d, at 608, and under that standard plainly found that Fulminante's statement to Sarivola had been coerced.

In applying the totality of the circumstances test to determine that the confession to Sarivola was coerced, the Arizona Supreme Court focused on a number of relevant facts. First, the court noted that "because [Fulminante] was an alleged child murderer, he was in danger of physical harm at the hands of other inmates." *Ibid.* In addition, Sarivola was aware that Fulminante had been receiving " 'rough treatment from the guys.' " *Id.*, at 244, n. 1, 778 P. 2d, at 609, n. 1. Using his knowledge of these threats, Sarivola offered to protect Fulminante in exchange for a confession to Jeneane's murder, *id.*, at 243, 778 P. 2d, at 608, and "[i]n response to Sarivola's offer of protection, [Fulminante] confessed." *Id.*, at 244, 778 P. 2d, at 609. Agreeing with Fulminante that "Sarivola's promise was 'extremely coercive,' " *id.*, at 243, 778 P. 2d, at 608, the Arizona court declared: "[T]he confession was obtained as a direct result of extreme coercion and was tendered in the belief that the defendant's life was in jeopardy if he did not confess. This is a true coerced confession in every sense of the word." *Id.*, at 262, 778 P. 2d, at 627.[2]

---

[2] There are additional facts in the record, not relied upon by the Arizona Supreme Court, which also support a finding of coercion. Fulminante possesses low average to average intelligence; he dropped out of school in the fourth grade. Record 88i, 88o. He is short in stature and slight in build. *Id.*, at 88. Although he had been in prison before, *ibid.*, he had not always adapted well to the stress of prison life. While incarcerated at the age of 26, he had "felt threatened by the [prison] population," *id.*, at 88x, and he therefore requested that he be placed in protective custody. Once there, however, he was unable to cope with the isolation and was admitted to a psychiatric hospital. *Id.*, at 88t–88b1. The Court has previously recognized that factors such as these are relevant in determining whether a defendant's will has been overborne. See, *e. g., Payne* v. *Arkansas*, 356 U. S. 560, 567 (1958) (lack of education); *Reck* v. *Pate*, 367 U. S. 433, 441

We normally give great deference to the factual findings of the state court. *Davis* v. *North Carolina*, 384 U. S. 737, 741 (1966); *Haynes* v. *Washington*, 373 U. S. 503, 515 (1963); *Culombe* v. *Connecticut*, 367 U. S. 568, 603–604 (1961). Nevertheless, "the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination." *Miller* v. *Fenton*, 474 U. S. 104, 110 (1985). See also *Mincey* v. *Arizona*, 437 U. S. 385, 398 (1978); *Davis, supra,* at 741–742; *Haynes, supra,* at 515; *Chambers* v. *Florida*, 309 U. S. 227, 228–229 (1940).

Although the question is a close one, we agree with the Arizona Supreme Court's conclusion that Fulminante's confession was coerced.[3] The Arizona Supreme Court found a credible threat of physical violence unless Fulminante confessed. Our cases have made clear that a finding of coercion need not depend upon actual violence by a government agent;[4] a credible threat is sufficient. As we have said, "coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn* v. *Alabama*, 361 U. S. 199, 206 (1960). See also *Culombe, supra,* at 584; *Reck* v. *Pate*, 367 U. S. 433, 440–441 (1961); *Rogers* v. *Richmond*, 365 U. S. 534, 540 (1961); *Payne* v. *Arkansas*, 356 U. S. 560, 561

---

(1961) (low intelligence). Cf. *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 226 (1973) (listing potential factors); *Culombe* v. *Connecticut*, 367 U. S. 568, 602 (1961) (same). In addition, we note that Sarivola's position as Fulminante's friend might well have made the latter particularly susceptible to the former's entreaties. See *Spano* v. *New York*, 360 U. S. 315, 323 (1959).

[3] Our prior cases have used the terms "coerced confession" and "involuntary confession" interchangeably "by way of convenient shorthand." *Blackburn* v. *Alabama*, 361 U. S. 199, 207 (1960). We use the former term throughout this opinion, as that is the term used by the Arizona Supreme Court.

[4] The parties agree that Sarivola acted as an agent of the Government when he questioned Fulminante about the murder and elicited the confession. Brief for Petitioner 19; Brief for Respondent 2.

(1958); *Watts* v. *Indiana*, 338 U. S. 49, 52 (1949). As in *Payne*, where the Court found that a confession was coerced because the interrogating police officer had promised that if the accused confessed, the officer would protect the accused from an angry mob outside the jailhouse door, 356 U. S., at 564–565, 567, so too here, the Arizona Supreme Court found that it was fear of physical violence, absent protection from his friend (and Government agent) Sarivola, which motivated Fulminante to confess. Accepting the Arizona court's finding, permissible on this record, that there was a credible threat of physical violence, we agree with its conclusion that Fulminante's will was overborne in such a way as to render his confession the product of coercion.

## III

Four of us, JUSTICES MARSHALL, BLACKMUN, STEVENS, and myself, would affirm the judgment of the Arizona Supreme Court on the ground that the harmless-error rule is inapplicable to erroneously admitted coerced confessions. We thus disagree with the Justices who have a contrary view.

The majority today abandons what until now the Court has regarded as the "axiomatic [proposition] that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, *Rogers* v. *Richmond*, 365 U. S. 534 [(1961)], and even though there is ample evidence aside from the confession to support the conviction. *Malinski* v. *New York*, 324 U. S. 401 [(1945)]; *Stroble* v. *California*, 343 U. S. 181 [(1952)]; *Payne* v. *Arkansas*, 356 U. S. 560." *Jackson* v. *Denno*, 378 U. S. 368, 376 (1964). The Court has repeatedly stressed that the view that the admission of a coerced confession can be harmless error because of the other evidence to support the verdict is "an impermissible doctrine," *Lynumn* v. *Illinois*, 372 U. S. 528, 537 (1963); for "the admission in ev-

idence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment," *Payne, supra,* at 568. See also *Rose* v. *Clark,* 478 U. S. 570, 578, n. 6 (1986); *New Jersey* v. *Portash,* 440 U. S. 450, 459 (1979); *Lego* v. *Twomey,* 404 U. S. 477, 483 (1972); *Chapman* v. *California,* 386 U. S. 18, 23, and n. 8 (1967); *Haynes* v. *Washington, supra,* at 518; *Blackburn* v. *Alabama, supra,* at 206; *Spano* v. *New York,* 360 U. S. 315, 324 (1959); *Brown* v. *Allen,* 344 U. S. 443, 475 (1953); *Stroble* v. *California,* 343 U. S. 181, 190 (1952); *Gallegos* v. *Nebraska,* 342 U. S. 55, 63 (1951); *Haley* v. *Ohio,* 332 U. S. 596, 599 (1948); *Malinski* v. *New York,* 324 U. S. 401, 404 (1945); *Lyons* v. *Oklahoma,* 322 U. S. 596, 597, n. 1 (1944). As the decisions in *Haynes* and *Payne, supra,* show, the rule was the same even when another confession of the defendant had been properly admitted into evidence. Today, a majority of the Court, without any justification, cf. *Arizona* v. *Rumsey,* 467 U. S. 203, 212 (1984), overrules this vast body of precedent without a word and in so doing dislodges one of the fundamental tenets of our criminal justice system.

In extending to coerced confessions the harmless-error rule of *Chapman* v. *California, supra,* the majority declares that because the Court has applied that analysis to numerous other "trial errors," there is no reason that it should not apply to an error of this nature as well. The four of us remain convinced, however, that we should abide by our cases that have refused to apply the harmless-error rule to coerced confessions, for a coerced confession is fundamentally different from other types of erroneously admitted evidence to which the rule has been applied. Indeed, as the majority concedes, *Chapman* itself recognized that prior cases "have indicated that there are some constitutional rights so basic to a fair trial that their infraction can *never* be treated as harmless error," and it placed in that category the constitutional rule against using a defendant's coerced confession against

him at his criminal trial. 386 U. S., at 23, and n. 8 (emphasis added). Moreover, cases since *Chapman* have reiterated the rule that using a defendant's coerced confession against him is a denial of due process of law regardless of the other evidence in the record aside from the confession. *Lego* v. *Twomey, supra,* at 483; *Mincey* v. *Arizona,* 437 U. S., at 398; *New Jersey* v. *Portash, supra,* at 459; *Rose* v. *Clark, supra,* at 577, 578, and n. 6.

*Chapman* specifically noted three constitutional errors that could not be categorized as harmless error: using a coerced confession against a defendant in a criminal trial, depriving a defendant of counsel, and trying a defendant before a biased judge. The majority attempts to distinguish the use of a coerced confession from the other two errors listed in *Chapman* first by distorting the decision in *Payne,* and then by drawing a meaningless dichotomy between "trial errors" and "structural defects" in the trial process. Viewing *Payne* as merely rejecting a test whereby the admission of a coerced confession could stand if there were "sufficient evidence," other than the confession, to support the conviction, the majority suggests that the Court in *Payne* might have reached a different result had it been considering a harmless-error test. *Post,* at 309 (opinion of REHNQUIST, C. J.). It is clear, though, that in *Payne* the Court recognized that *regardless* of the amount of other evidence, "the admission in evidence, over objection, of the coerced confession vitiates the judgment," because "where, as here, a coerced confession constitutes a part of the evidence before the jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession." 356 U. S., at 568. The inability to assess its effect on a conviction causes the admission at trial of a coerced confession to "defy analysis by 'harmless-error' standards," cf. *post,* at 309 (opinion of REHNQUIST, C. J.), just as certainly as do deprivation of counsel and trial before a biased judge.

The majority also attempts to distinguish "trial errors" which occur "during the presentation of the case to the jury," *post*, at 307, and which it deems susceptible to harmless-error analysis, from "structural defects in the constitution of the trial mechanism," *post*, at 309, which the majority concedes cannot be so analyzed. This effort fails, for our jurisprudence on harmless error has not classified so neatly the errors at issue. For example, we have held susceptible to harmless-error analysis the failure to instruct the jury on the presumption of innocence, *Kentucky* v. *Whorton*, 441 U. S. 786 (1979), while finding it impossible to analyze in terms of harmless error the failure to instruct a jury on the reasonable-doubt standard, *Jackson* v. *Virginia*, 443 U. S. 307, 320, n. 14 (1979). These cases cannot be reconciled by labeling the former "trial error" and the latter not, for both concern the exact same stage in the trial proceedings. Rather, these cases can be reconciled only by considering the nature of the right at issue and the effect of an error upon the trial. A jury instruction on the presumption of innocence is not constitutionally required in every case to satisfy due process, because such an instruction merely offers an additional safeguard beyond that provided by the constitutionally required instruction on reasonable doubt. See *Whorton, supra*, at 789; *Taylor* v. *Kentucky*, 436 U. S. 478, 488–490 (1978). While it may be possible to analyze as harmless the omission of a presumption of innocence instruction when the required reasonable-doubt instruction has been given, it is impossible to assess the effect on the jury of the omission of the more fundamental instruction on reasonable doubt. In addition, omission of a reasonable-doubt instruction, though a "trial error," distorts the very structure of the trial because it creates the risk that the jury will convict the defendant even if the State has not met its required burden of proof. Cf. *Cool* v. *United States*, 409 U. S. 100, 104 (1972); *In re Winship*, 397 U. S. 358, 364 (1970).

These same concerns counsel against applying harmless-error analysis to the admission of a coerced confession. A defendant's confession is "probably the most probative and damaging evidence that can be admitted against him," *Cruz v. New York*, 481 U. S. 186, 195 (1987) (WHITE, J., dissenting), so damaging that a jury should not be expected to ignore it even if told to do so, *Bruton v. United States*, 391 U. S. 123, 140 (1968) (WHITE, J., dissenting), and because in any event it is impossible to know what credit and weight the jury gave to the confession. Cf. *Payne, supra,* at 568. Concededly, this reason is insufficient to justify a *per se* bar to the use of *any* confession. Thus, *Milton v. Wainwright,* 407 U. S. 371 (1972), applied harmless-error analysis to a confession obtained and introduced in circumstances that violated the defendant's Sixth Amendment right to counsel.[5] Similarly, the Courts of Appeals have held that the introduction of incriminating statements taken from defendants in violation of *Miranda v. Arizona,* 384 U. S. 436 (1966), is subject to treatment as harmless error.[6]

Nevertheless, in declaring that it is "impossible to create a meaningful distinction between confessions elicited in violation of the Sixth Amendment and those in violation of the Fourteenth Amendment," *post,* at 312 (opinion of REHNQUIST, C. J.), the majority overlooks the obvious. Neither *Milton v. Wainwright* nor any of the other cases upon which

---

[5] In *Satterwhite v. Texas,* 486 U. S. 249 (1988), and *Moore v. Illinois,* 434 U. S. 220 (1977), the harmless-error rule was applied to the admission of evidence in violation of the Sixth Amendment Counsel Clause, but in neither case did the error involve admitting a confession or an incriminating statement of the defendant, which was the case in *Milton v. Wainwright.*

[6] *Howard v. Pung,* 862 F. 2d 1348, 1351 (CA8 1988), cert. denied, 492 U. S. 920 (1989); *United States v. Johnson,* 816 F. 2d 918, 923 (CA3 1987); *Bryant v. Vose,* 785 F. 2d 364, 367 (CA1), cert. denied, 477 U. S. 907 (1986); *Martin v. Wainwright,* 770 F. 2d 918, 932 (CA11 1985), modified, 781 F. 2d 185, cert. denied, 479 U. S. 909 (1986); *United States v. Ramirez,* 710 F. 2d 535, 542–543 (CA9 1983); *Harryman v. Estelle,* 616 F. 2d 870, 875 (CA5) (en banc), cert. denied, 449 U. S. 860 (1980).

the majority relies involved a defendant's *coerced* confession, nor were there present in these cases the distinctive reasons underlying the exclusion of coerced incriminating statements of the defendant.[7] First, some coerced confessions may be untrustworthy. *Jackson* v. *Denno*, 378 U. S., at 385–386; *Spano* v. *New York*, 360 U. S., at 320. Consequently, admission of coerced confessions may distort the truth-seeking function of the trial upon which the majority focuses. More importantly, however, the use of coerced confessions, "whether true or false," is forbidden "because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth," *Rogers* v. *Richmond*, 365 U. S., at 540–541; see also *Lego*, 404 U. S., at 485. This reflects the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will," *Blackburn* v. *Alabama*, 361 U. S., at 206–207, as well as "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves," *Spano*, *supra*, at 320–321. Thus, permitting a coerced confession to be part of the evidence on which a jury is free to base its verdict of guilty is inconsistent with the thesis that ours is not an

---

[7] The same can be said of the *Miranda* cases. As the Court has recognized, a *Miranda* violation "does not mean that the statements received have actually been coerced, but only that the courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." *Oregon* v. *Elstad*, 470 U. S. 298, 310 (1985). See also *New York* v. *Quarles*, 467 U. S. 649, 654 (1984).

inquisitorial system of criminal justice. Cf. *Chambers* v. *Florida*, 309 U. S., at 235–238.

As the majority concedes, there are other constitutional errors that invalidate a conviction even though there may be no reasonable doubt that the defendant is guilty and would be convicted absent the trial error. For example, a judge in a criminal trial "is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict, see *Sparf & Hansen* v. *United States*, 156 U. S. 51, 105 (1895); *Carpenters* v. *United States*, 330 U. S. 395, 408 (1947), regardless of how overwhelmingly the evidence may point in that direction." *United States* v. *Martin Linen Supply Co.*, 430 U. S. 564, 572–573 (1977). A defendant is entitled to counsel at trial, *Gideon* v. *Wainwright*, 372 U. S. 335 (1963), and as *Chapman* recognized, violating this right can never be harmless error. 386 U. S., at 23, and n. 8. See also *White* v. *Maryland*, 373 U. S. 59 (1963), where a conviction was set aside because the defendant had not had counsel at a preliminary hearing without regard to the showing of prejudice. In *Vasquez* v. *Hillery*, 474 U. S. 254 (1986), a defendant was found guilty beyond reasonable doubt, but the conviction had been set aside because of the unlawful exclusion of members of the defendant's race from the grand jury that indicted him, despite overwhelming evidence of his guilt. The error at the grand jury stage struck at fundamental values of our society and "undermine[d] the structural integrity of the criminal tribunal itself, and [was] not amenable to harmless-error review." *Id.*, at 263–264. *Vasquez*, like *Chapman*, also noted that rule of automatic reversal when a defendant is tried before a judge with a financial interest in the outcome, *Tumey* v. *Ohio*, 273 U. S. 510, 535 (1927), despite a lack of any indication that bias influenced the decision. *Waller* v. *Georgia*, 467 U. S. 39, 49 (1984), recognized that violation of the guarantee of a public trial required reversal without any showing of prejudice and even though the values

of a public trial may be intangible and unprovable in any particular case.

The search for truth is indeed central to our system of justice, but "certain constitutional rights are not, and should not be, subject to harmless-error analysis because those rights protect important values that are unrelated to the truth-seeking function of the trial." *Rose* v. *Clark*, 478 U. S., at 587 (STEVENS, J., concurring in judgment). The right of a defendant not to have his coerced confession used against him is among those rights, for using a coerced confession "abort[s] the basic trial process" and "render[s] a trial fundamentally unfair." *Id.*, at 577, 578, n. 6.

For the foregoing reasons the four of us would adhere to the consistent line of authority that has recognized as a basic tenet of our criminal justice system, before and after both *Miranda* and *Chapman*, the prohibition against using a defendant's coerced confession against him at his criminal trial. *Stare decisis* is "of fundamental importance to the rule of law," *Welch* v. *Texas Dept. of Highways and Public Transportation*, 483 U. S. 468, 494 (1987); the majority offers no convincing reason for overturning our long line of decisions requiring the exclusion of coerced confessions.

## IV

Since five Justices have determined that harmless-error analysis applies to coerced confessions, it becomes necessary to evaluate under that ruling the admissibility of Fulminante's confession to Sarivola. Cf. *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1, 45 (1989) (WHITE, J., concurring in judgment in part and dissenting in part); *id.*, at 57 (O'CONNOR, J., dissenting). *Chapman* v. *California*, 386 U. S., at 24, made clear that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." The Court has the power to review the record *de novo* in order to determine an error's harmlessness. See *ibid.; Satterwhite* v.

*Texas*, 486 U. S., at 258. In so doing, it must be determined whether the State has met its burden of demonstrating that the admission of the confession to Sarivola did not contribute to Fulminante's conviction. *Chapman, supra*, at 26. Five of us are of the view that the State has not carried its burden and accordingly affirm the judgment of the court below reversing respondent's conviction.

A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Bruton* v. *United States*, 391 U. S., at 139–140 (WHITE, J., dissenting). See also *Cruz* v. *New York*, 481 U. S., at 195 (WHITE, J., dissenting) (citing *Bruton*). While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision. In the case of a coerced confession such as that given by Fulminante to Sarivola, the risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless.

In the Arizona Supreme Court's initial opinion, in which it determined that harmless-error analysis could be applied to the confession, the court found that the admissible second confession to Donna Sarivola rendered the first confession to Anthony Sarivola cumulative. 161 Ariz., at 245–246, 778 P. 2d, at 610–611. The court also noted that circumstantial physical evidence concerning the wounds, the ligature around Jeneane's neck, the location of the body, and the presence of

motorcycle tracks at the scene corroborated the second confession. *Ibid.* The court concluded that "due to the overwhelming evidence adduced from the second confession, if there had not been a first confession, the jury would still have had the same basic evidence to convict" Fulminante. *Id.*, at 246, 778 P. 2d, at 611.

We have a quite different evaluation of the evidence. Our review of the record leads us to conclude that the State has failed to meet its burden of establishing, beyond a reasonable doubt, that the admission of Fulminante's confession to Anthony Sarivola was harmless error. Three considerations compel this result.

First, the transcript discloses that both the trial court and the State recognized that a successful prosecution depended on the jury believing the two confessions. Absent the confessions, it is unlikely that Fulminante would have been prosecuted at all, because the physical evidence from the scene and other circumstantial evidence would have been insufficient to convict. Indeed, no indictment was filed until nearly two years after the murder.[8] App. 2. Although the police had suspected Fulminante from the beginning, as the prosecutor acknowledged in his opening statement to the jury, "[W]hat brings us to Court, what makes this case fileable, and prosecutable and triable is that later, Mr. Fulminante confesses this crime to Anthony Sarivola and later, to Donna Sarivola, his wife." *Id.*, at 65–66. After trial began, during a renewed hearing on Fulminante's motion to suppress, the trial court opined, "You know, I think from what little I know about this trial, the character of this man [Sarivola] for truthfulness or untruthfulness and his credibility is the centerpiece of this case, is it not?" The prosecutor responded, "It's very important, there's no doubt." *Id.*, at 62. Finally, in his

---

[8] Although Fulminante had allegedly confessed to Donna Sarivola several months previously, police did not yet know of this confession, which Anthony Sarivola did not mention to them until June 1985. App. 90–92. They did, however, know of the first confession, which Fulminante had given to Anthony Sarivola nearly a year before.

closing argument, the prosecutor prefaced his discussion of the two confessions by conceding: "[W]e have a lot of [circumstantial] evidence that indicates that this is our suspect, this is the fellow that did it, but it's a little short as far as saying that it's proof that he actually put the gun to the girl's head and killed her. So it's a little short of that. We recognize that." 10 Tr. 75 (Dec. 17, 1985).

Second, the jury's assessment of the confession to Donna Sarivola could easily have depended in large part on the presence of the confession to Anthony Sarivola. Absent the admission at trial of the first confession, the jurors might have found Donna Sarivola's story unbelievable. Fulminante's confession to Donna Sarivola allegedly occurred in May 1984, on the day he was released from Ray Brook, as she and Anthony Sarivola drove Fulminante from New York to Pennsylvania. Donna Sarivola testified that Fulminante, whom she had never before met, confessed in detail about Jeneane's brutal murder in response to her casual question concerning why he was going to visit friends in Pennsylvania instead of returning to his family in Arizona. App. 167–168. Although she testified that she was "disgusted" by Fulminante's disclosures, id., at 169, she stated that she took no steps to notify authorities of what she had learned, id., at 172–173. In fact, she claimed that she barely discussed the matter with Anthony Sarivola, who was in the car and overheard Fulminante's entire conversation with Donna. Id., at 174–175. Despite her disgust for Fulminante, Donna Sarivola later went on a second trip with him. Id., at 173–174. Although Sarivola informed authorities that he had driven Fulminante to Pennsylvania, he did not mention Donna's presence in the car or her conversation with Fulminante. Id., at 159–161. Only when questioned by authorities in June 1985 did Anthony Sarivola belatedly recall the confession to Donna more than a year before, and only then did he ask if she would be willing to discuss the matter with authorities. Id., at 90–92.

Although some of the details in the confession to Donna Sarivola were corroborated by circumstantial evidence, many, including details that Jeneane was choked and sexually assaulted, were not. *Id.*, at 186–188. As to other aspects of the second confession, including Fulminante's motive and state of mind, the *only* corroborating evidence was the first confession to Anthony Sarivola.[9] No. CR 142821 (Super. Ct. Maricopa County, Ariz., Feb. 11, 1986), pp. 3–4. Thus, contrary to what the Arizona Supreme Court found, it is clear that the jury might have believed that the two confessions reinforced and corroborated each other. For this reason, one confession was *not* merely cumulative of the other. While in some cases two confessions, delivered on different occasions to different listeners, might be viewed as being independent of each other, cf. *Milton* v. *Wainwright*, 407 U. S. 371 (1972), it strains credulity to think that the jury so viewed the two confessions in this case, especially given the close relationship between Donna and Anthony Sarivola.

---

[9] The inadmissible confession to Anthony Sarivola was itself subject to serious challenge. Sarivola's lack of moral integrity was demonstrated by his testimony that he had worked for organized crime during the time he was a uniformed police officer. App. 74–75, 104–105. His overzealous approach to gathering information for which he would be paid by authorities, *id.*, at 79, was revealed by his admission that he had fabricated a tape recording in connection with an earlier, unrelated FBI investigation, *id.*, at 96–98. He received immunity in connection with the information he provided. *Id.*, at 129. His eagerness to get in and stay in the federal Witness Protection Program provided a motive for giving detailed information to authorities. *Id.*, at 114, 129–131. During his first report of the confession, Sarivola failed to hint at numerous details concerning an alleged sexual assault on Jeneane; he mentioned them for the first time more than a year later during further interrogation, at which he also recalled, for the first time, the confession to Donna Sarivola. *Id.*, at 90–92, 148–149. The impeaching effect of each of these factors was undoubtedly undercut by the presence of the second confession, which, not surprisingly, recounted a quite similar story and thus corroborated the first confession. Thus, each confession, though easily impeachable if viewed in isolation, became difficult to discount when viewed in conjunction with the other.

The jurors could also have believed that Donna Sarivola had a motive to lie about the confession in order to assist her husband. Anthony Sarivola received significant benefits from federal authorities, including payment for information, immunity from prosecution, and eventual placement in the federal Witness Protection Program. App. 79, 114, 129–131. In addition, the jury might have found Donna motivated by her own desire for favorable treatment, for she, too, was ultimately placed in the Witness Protection Program. *Id.*, at 176, 179–180.

Third, the admission of the first confession led to the admission of other evidence prejudicial to Fulminante. For example, the State introduced evidence that Fulminante knew of Sarivola's connections with organized crime in an attempt to explain why Fulminante would have been motivated to confess to Sarivola in seeking protection. *Id.*, at 45–48, 67. Absent the confession, this evidence would have had no relevance and would have been inadmissible at trial. The Arizona Supreme Court found that the evidence of Sarivola's connections with organized crime reflected on Sarivola's character, not Fulminante's, and noted that the evidence could have been used to impeach Sarivola. 161 Ariz., at 245–246, 778 P. 2d, at 610–611. This analysis overlooks the fact that had the confession not been admitted, there would have been no reason for Sarivola to testify and thus no need to impeach his testimony. Moreover, we cannot agree that the evidence did not reflect on Fulminante's character as well, for it depicted him as someone who willingly sought out the company of criminals. It is quite possible that this evidence led the jury to view Fulminante as capable of murder.[10]

---

[10] Fulminante asserts that other prejudicial evidence, including his prior felony convictions and incarcerations, and his prison reputation for untruthfulness, likewise would not have been admitted had the confession to Sarivola been excluded. Brief for Respondent 31–32. Because we find that the admission of the confession was not harmless in any event, we ex-

Finally, although our concern here is with the effect of the erroneous admission of the confession on Fulminante's conviction, it is clear that the presence of the confession also influenced the sentencing phase of the trial. Under Arizona law, the trial judge is the sentencer. Ariz. Rev. Stat. Ann. § 13–703(B) (1989). At the sentencing hearing, the admissibility of information regarding aggravating circumstances is governed by the rules of evidence applicable to criminal trials. § 13–703(C). In this case, "based upon admissible evidence produced at the trial," No. CR 142821, *supra*, at 2, the judge found that only one aggravating circumstance existed beyond a reasonable doubt, *i. e.*, that the murder was committed in "an *especially* heinous, cruel, and depraved manner." *Ibid.;* see § 13–703(F)(6). In reaching this conclusion, the judge relied heavily on evidence concerning the manner of the killing and Fulminante's motives and state of mind which could only be found in the two confessions. For example, in labeling the murder "cruel," the judge focused in part on Fulminante's alleged statements that he choked Jeneane and made her get on her knees and beg before killing her. No. CR 142821, *supra*, at 3. Although the circumstantial evidence was not inconsistent with this determination, neither was it sufficient to make such a finding beyond a reasonable doubt. Indeed, the sentencing judge acknowledged that the confessions were only partly corroborated by other evidence. *Ibid.*

In declaring that Fulminante "acted with an especially heinous and depraved state of mind," the sentencing judge relied solely on the two confessions. *Id.*, at 4. While the judge found that the statements in the confessions regarding the alleged sexual assault on Jeneane should not be considered on the issue of cruelty because they were not corroborated by other evidence, the judge determined that they were worthy of belief on the issue of Fulminante's state of

press no opinion as to the effect any of this evidence might have had on Fulminante's conviction.

mind. *Ibid.* The judge then focused on Anthony Sarivola's statement that Fulminante had made vulgar references to Jeneane during the first confession, and on Donna Sarivola's statement that Fulminante had made similar comments to her. *Ibid.* Finally, the judge stressed that Fulminante's alleged comments to the Sarivolas concerning torture, choking, and sexual assault, "whether they all occurred or not," *ibid.*, depicted "a man who was bragging and relishing the crime he committed." *Id.*, at 5.

Although the sentencing judge might have reached the same conclusions even without the confession to Anthony Sarivola, it is impossible to say so beyond a reasonable doubt. Furthermore, the judge's assessment of Donna Sarivola's credibility, and hence the reliability of the second confession, might well have been influenced by the corroborative effect of the erroneously admitted first confession. Indeed, the fact that the sentencing judge focused on the similarities between the two confessions in determining that they were reliable suggests that either of the confessions alone, even when considered with all the other evidence, would have been insufficient to permit the judge to find an aggravating circumstance beyond a reasonable doubt as a requisite prelude to imposing the death penalty.

Because a majority of the Court has determined that Fulminante's confession to Anthony Sarivola was coerced and because a majority has determined that admitting this confession was not harmless beyond a reasonable doubt, we agree with the Arizona Supreme Court's conclusion that Fulminante is entitled to a new trial at which the confession is not admitted. Accordingly the judgment of the Arizona Supreme Court is

*Affirmed.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, JUSTICE KENNEDY and JUSTICE SOUTER join as to Parts I and II, and JUSTICE SCALIA joins as to Parts II and

III, delivered the opinion of the Court with respect to Part II, and a dissenting opinion with respect to Parts I and III.

The Court today properly concludes that the admission of an "involuntary" confession at trial is subject to harmless-error analysis. Nonetheless, the independent review of the record which we are required to make shows that respondent Fulminante's confession was not in fact involuntary. And even if the confession were deemed to be involuntary, the evidence offered at trial, including a second, untainted confession by Fulminante, supports the conclusion that any error here was certainly harmless.

## I

The question whether respondent Fulminante's confession was voluntary is one of federal law. "Without exception, the Court's confession cases hold that the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination." *Miller* v. *Fenton*, 474 U. S. 104, 110 (1985). In *Mincey* v. *Arizona*, 437 U. S. 385 (1978), we overturned a determination by the Supreme Court of Arizona that a statement of the defendant was voluntary, saying "we are not bound by the Arizona Supreme Court's holding that the statements were voluntary. Instead, this Court is under a duty to make an independent evaluation of the record." *Id.*, at 398.

The admissibility of a confession such as that made by respondent Fulminante depends upon whether it was voluntarily made. "The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

*Culombe* v. *Connecticut,* 367 U. S. 568, 602 (1961) (quoted in *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 225–226 (1973)).

In this case the parties stipulated to the basic facts at the hearing in the Arizona trial court on respondent's motion to suppress the confession. Anthony Sarivola, an inmate at the Ray Brook Prison, was a paid confidential informant for the FBI. While at Ray Brook, various rumors reached Sarivola that Oreste Fulminante, a fellow inmate who had befriended Sarivola, had killed his stepdaughter in Arizona. Sarivola passed these rumors on to his FBI contact, who told him "to find out more about it." Sarivola, having already discussed the rumors with respondent on several occasions, asked him whether the rumors were true, adding that he might be in a position to protect Fulminante from physical recriminations in prison, but that "[he] must tell him the truth." Fulminante then confessed to Sarivola that he had in fact killed his stepdaughter in Arizona, and provided Sarivola with substantial details about the manner in which he killed the child. At the suppression hearing, Fulminante stipulated to the fact that "[a]t no time did the defendant indicate he was in fear of other inmates nor did he ever seek Mr. Sarivola's 'protection.'" App. 10. The trial court was also aware, through an excerpt from Sarivola's interview testimony which respondent appended to his reply memorandum, that Sarivola believed Fulminante's time was "running short" and that he would "have went out of the prison horizontally." *Id.,* at 28. The trial court found that respondent's confession was voluntary.

The Supreme Court of Arizona stated that the trial court committed no error in finding the confession voluntary based on the record before it. But it overturned the trial court's finding of voluntariness based on the more comprehensive trial record before it, which included, in addition to the facts stipulated at the suppression hearing, a statement made by Sarivola at the trial that "the defendant had been receiving 'rough treatment from the guys, and if the defendant would

tell the truth, he could be protected.'"   161 Ariz. 237, 244, n. 1, 778 P. 2d 602, 609, n. 1 (1989).   It also had before it the presentence report, which showed that Fulminante was no stranger to the criminal justice system: He had six prior felony convictions and had been imprisoned on three prior occasions.

On the basis of the record before it, the Supreme Court stated:

"Defendant contends that because he was an alleged child murderer, he was in danger of physical harm at the hands of other inmates.   Sarivola was aware that defendant faced the possibility of retribution from other inmates, and that in return for the confession with respect to the victim's murder, Sarivola would protect him. Moreover, the defendant maintains that Sarivola's promise was 'extremely coercive' because the 'obvious' inference from the promise was that his life would be in jeopardy if he did not confess.   We agree." *Id.*, at 243, 778 P. 2d, at 608.

Exercising our responsibility to make the independent examination of the record necessary to decide this federal question, I am at a loss to see how the Supreme Court of Arizona reached the conclusion that it did.   Fulminante offered no evidence that he believed that his life was in danger or that he in fact confessed to Sarivola in order to obtain the proffered protection.   Indeed, he had stipulated that "[a]t no time did the defendant indicate he was in fear of other inmates nor did he ever seek Mr. Sarivola's 'protection.'" App. 10.   Sarivola's testimony that he told Fulminante that "if [he] would tell the truth, he could be protected," adds little if anything to the substance of the parties' stipulation. The decision of the Supreme Court of Arizona rests on an assumption that is squarely contrary to this stipulation, and one that is not supported by any testimony of Fulminante.

The facts of record in the present case are quite different from those present in cases where we have found confessions

to be coerced and involuntary. Since Fulminante was unaware that Sarivola was an FBI informant, there existed none of "the danger of coercion result[ing] from the interaction of custody and official interrogation." *Illinois* v. *Perkins*, 496 U. S. 292, 297 (1990). The fact that Sarivola was a Government informant does not by itself render Fulminante's confession involuntary, since we have consistently accepted the use of informants in the discovery of evidence of a crime as a legitimate investigatory procedure consistent with the Constitution. See, *e. g.*, *Kuhlmann* v. *Wilson*, 477 U. S. 436 (1986); *United States* v. *White*, 401 U. S. 745 (1971); *Hoffa* v. *United States*, 385 U. S. 293, 304 (1966). The conversations between Sarivola and Fulminante were not lengthy, and the defendant was free at all times to leave Sarivola's company. Sarivola at no time threatened him or demanded that he confess; he simply requested that he speak the truth about the matter. Fulminante was an experienced habitue of prisons and presumably able to fend for himself. In concluding on these facts that Fulminante's confession was involuntary, the Court today embraces a more expansive definition of that term than is warranted by any of our decided cases.

II

Since this Court's landmark decision in *Chapman* v. *California*, 386 U. S. 18 (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless. See, *e. g.*, *Clemons* v. *Mississippi*, 494 U. S. 738, 752–754 (1990) (unconstitutionally overbroad jury instructions at the sentencing stage of a capital case); *Satterwhite* v. *Texas*, 486 U. S. 249 (1988) (admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause); *Carella* v. *California*, 491 U. S. 263, 266 (1989)

(jury instruction containing an erroneous conclusive presumption); *Pope* v. *Illinois*, 481 U. S. 497, 501–504 (1987) (jury instruction misstating an element of the offense); *Rose* v. *Clark*, 478 U. S. 570 (1986) (jury instruction containing an erroneous rebuttable presumption); *Crane* v. *Kentucky*, 476 U. S. 683, 691 (1986) (erroneous exclusion of defendant's testimony regarding the circumstances of his confession); *Delaware* v. *Van Arsdall*, 475 U. S. 673 (1986) (restriction on a defendant's right to cross-examine a witness for bias in violation of the Sixth Amendment Confrontation Clause); *Rushen* v. *Spain*, 464 U. S. 114, 117–118, and n. 2 (1983) (denial of a defendant's right to be present at trial); *United States* v. *Hasting*, 461 U. S. 499 (1983) (improper comment on defendant's silence at trial, in violation of the Fifth Amendment Self-Incrimination Clause); *Hopper* v. *Evans*, 456 U. S. 605 (1982) (statute improperly forbidding trial court's giving a jury instruction on a lesser included offense in a capital case in violation of the Due Process Clause); *Kentucky* v. *Whorton*, 441 U. S. 786 (1979) (failure to instruct the jury on the presumption of innocence); *Moore* v. *Illinois*, 434 U. S. 220, 232 (1977) (admission of identification evidence in violation of the Sixth Amendment Confrontation Clause); *Brown* v. *United States*, 411 U. S. 223, 231–232 (1973) (admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Confrontation Clause); *Milton* v. *Wainwright*, 407 U. S. 371 (1972) (confession obtained in violation of *Massiah* v. *United States*, 377 U. S. 201 (1964)); *Chambers* v. *Maroney*, 399 U. S. 42, 52–53 (1970) (admission of evidence obtained in violation of the Fourth Amendment); *Coleman* v. *Alabama*, 399 U. S. 1, 10–11 (1970) (denial of counsel at a preliminary hearing in violation of the Sixth Amendment Counsel Clause).

The common thread connecting these cases is that each involved "trial error"—error which occurred during the presentation of the case to the jury, and which may therefore

be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. In applying harmless-error analysis to these many different constitutional violations, the Court has been faithful to the belief that the harmless-error doctrine is essential to preserve the "principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Van Arsdall, supra,* at 681 (citations omitted).

In *Chapman* v. *California, supra,* the Court stated:

"Although our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error,[8] this statement in *Fahy* itself belies any belief that all trial errors which violate the Constitution automatically call for reversal.

"[8] See, *e. g., Payne* v. *Arkansas*, 356 U. S. 560 (coerced confession); *Gideon* v. *Wainwright*, 372 U. S. 335 (right to counsel); *Tumey* v. *Ohio*, 273 U. S. 510 (impartial judge)."

*Id.,* at 23.

It is on the basis of this language in *Chapman* that JUSTICE WHITE in dissent concludes that the principle of *stare decisis* requires us to hold that an involuntary confession is not subject to harmless-error analysis. We believe that there are several reasons which lead to a contrary conclusion. In the first place, the quoted language from *Chapman* does not by its terms adopt any such rule in that case. The language that "[a]lthough our prior cases have indicated," coupled with the relegation of the cases themselves to a footnote, is more appropriately regarded as a historical reference to the holdings of these cases. This view is buttressed by an examination of the opinion in *Payne* v. *Arkansas*, 356 U. S. 560 (1958), which is the case referred to for the proposition that

an involuntary confession may not be subject to harmless-error analysis. There the Court said:

> "Respondent suggests that, apart from the confession, there was adequate evidence before the jury to sustain the verdict. But where, as here, an involuntary confession constitutes a part of the evidence before the jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession. And in these circumstances this Court has uniformly held that even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment." *Id.*, at 567–568.

It is apparent that the State's argument which the Court rejected in *Payne* is not the harmless-error analysis later adopted in *Chapman*, but a much more lenient rule which would allow affirmance of a conviction if the evidence other than the involuntary confession was sufficient to sustain the verdict. This is confirmed by the dissent of Justice Clark in that case, which adopted the more lenient test. Such a test would, of course—unlike the harmless-error test—make the admission of an involuntary confession virtually risk free for the State.

The admission of an involuntary confession—a classic "trial error"—is markedly different from the other two constitutional violations referred to in the *Chapman* footnote as not being subject to harmless-error analysis. One of those violations, involved in *Gideon* v. *Wainwright*, 372 U. S. 335 (1963), was the total deprivation of the right to counsel at trial. The other violation, involved in *Tumey* v. *Ohio*, 273 U. S. 510 (1927), was a judge who was not impartial. These are structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards. The entire conduct of the trial from beginning to end is obvi-

ously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial. Since our decision in *Chapman*, other cases have added to the category of constitutional errors which are not subject to harmless error the following: unlawful exclusion of members of the defendant's race from a grand jury, *Vasquez* v. *Hillery*, 474 U. S. 254 (1986); the right to self-representation at trial, *McKaskle* v. *Wiggins*, 465 U. S. 168, 177–178, n. 8 (1984); and the right to public trial, *Waller* v. *Georgia*, 467 U. S. 39, 49, n. 9 (1984). Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. "Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Rose* v. *Clark*, 478 U. S., at 577–578 (citation omitted).

It is evident from a comparison of the constitutional violations which we have held subject to harmless error, and those which we have held not, that involuntary statements or confessions belong in the former category. The admission of an involuntary confession is a "trial error," similar in both degree and kind to the erroneous admission of other types of evidence. The evidentiary impact of an involuntary confession, and its effect upon the composition of the record, is indistinguishable from that of a confession obtained in violation of the Sixth Amendment — of evidence seized in violation of the Fourth Amendment — or of a prosecutor's improper comment on a defendant's silence at trial in violation of the Fifth Amendment. When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.

Nor can it be said that the admission of an involuntary confession is the type of error which "transcends the criminal process." This Court has applied harmless-error analysis to the violation of other constitutional rights similar in magnitude and importance and involving the same level of police misconduct. For instance, we have previously held that the admission of a defendant's statements obtained in violation of the Sixth Amendment is subject to harmless-error analysis. In *Milton* v. *Wainwright*, 407 U. S. 371 (1972), the Court held the admission of a confession obtained in violation of *Massiah* v. *United States*, 377 U. S. 201 (1964), to be harmless beyond a reasonable doubt. We have also held that the admission of an out-of-court statement by a nontestifying codefendant is subject to harmless-error analysis. *Brown* v. *United States*, 411 U. S., at 231–232; *Schneble* v. *Florida*, 405 U. S. 427 (1972); *Harrington* v. *California*, 395 U. S. 250 (1969). The inconsistent treatment of statements elicited in violation of the Sixth and Fourteenth Amendments, respectively, can be supported neither by evidentiary or deterrence concerns nor by a belief that there is something more "fundamental" about involuntary confessions. This is especially true in a case such as this one where there are no allegations of physical violence on behalf of the police. A confession obtained in violation of the Sixth Amendment has the same evidentiary impact as does a confession obtained in violation of a defendant's due process rights. Government misconduct that results in violations of the Fourth and Sixth Amendments may be at least as reprehensible as conduct that results in an involuntary confession. For instance, the prisoner's confession to an inmate-informer at issue in *Milton*, which the Court characterized as implicating the Sixth Amendment right to counsel, is similar on its facts to the one we face today. Indeed, experience shows that law enforcement violations of these constitutional guarantees can involve conduct as egregious as police conduct used to elicit statements in violation of the Fourteenth Amendment. It is thus

impossible to create a meaningful distinction between confessions elicited in violation of the Sixth Amendment and those in violation of the Fourteenth Amendment.

Of course an involuntary confession may have a more dramatic effect on the course of a trial than do other trial errors—in particular cases it may be devastating to a defendant—but this simply means that a reviewing court will conclude in such a case that its admission was not harmless error; it is not a reason for eschewing the harmless-error test entirely. The Supreme Court of Arizona, in its first opinion in the present case, concluded that the admission of Fulminante's confession *was* harmless error. That court concluded that a second and more explicit confession of the crime made by Fulminante after he was released from prison was not tainted by the first confession, and that the second confession, together with physical evidence from the wounds (the victim had been shot twice in the head with a large calibre weapon at close range and a ligature was found around her neck) and other evidence introduced at trial rendered the admission of the first confession harmless beyond a reasonable doubt. 161 Ariz., at 245–246, 778 P. 2d, at 610–611.

## III

I would agree with the finding of the Supreme Court of Arizona in its initial opinion—in which it believed harmless-error analysis was applicable to the admission of involuntary confessions—that the admission of Fulminante's confession was harmless. Indeed, this seems to me to be a classic case of harmless error: a second confession giving more details of the crime than the first was admitted in evidence and found to be free of any constitutional objection. Accordingly, I would affirm the holding of the Supreme Court of Arizona in its initial opinion and reverse the judgment which it ultimately rendered in this case.

JUSTICE KENNEDY, concurring in the judgment.

For the reasons stated by THE CHIEF JUSTICE, I agree that Fulminante's confession to Anthony Sarivola was not coerced.   In my view, the trial court did not err in admitting this testimony.   A majority of the Court, however, finds the confession coerced and proceeds to consider whether harmless-error analysis may be used when a coerced confession has been admitted at trial.   With the case in this posture, it is appropriate for me to address the harmless-error issue.

Again for the reasons stated by THE CHIEF JUSTICE, I agree that harmless-error analysis should apply in the case of a coerced confession.   That said, the court conducting a harmless-error inquiry must appreciate the indelible impact a full confession may have on the trier of fact, as distinguished, for instance, from the impact of an isolated statement that incriminates the defendant only when connected with other evidence.   If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case.   Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal defendant's plea of innocence. For the reasons given by JUSTICE WHITE in Part IV of his opinion, I cannot with confidence find admission of Fulminante's confession to Anthony Sarivola to be harmless error.

The same majority of the Court does not agree on the three issues presented by the trial court's determination to admit Fulminante's first confession: whether the confession was inadmissible because coerced; whether harmless-error analysis is appropriate; and if so whether any error was harmless here.   My own view that the confession was not coerced does not command a majority.

In the interests of providing a clear mandate to the Arizona Supreme Court in this capital case, I deem it proper to accept in the case now before us the holding of five Justices that the

confession was coerced and inadmissible. I agree with a majority of the Court that admission of the confession could not be harmless error when viewed in light of all the other evidence; and so I concur in the judgment to affirm the ruling of the Arizona Supreme Court.