O’Neill, J.,
dissenting.
{¶ 311} Once again, I am compelled to dissent from this court’s affirmance of a death sentence. Here, the court places its imprimatur on the execution of an intellectually disabled man, despite the fact that the only evidence presented strongly tends to establish that the victim’s injury and death were unintended.
{¶ 312} I do not expect that the court will adopt my view that the death penalty is cruel and unusual and therefore constitutionally forbidden anytime soon. See, e.g., State v. Wogenstahl, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900, ¶ 2 (O’Neill, J., dissenting). But I do believe that at some point in the near future this court will be forced to recognize that Ohio’s death penalty reaches too far, to too many crimes and to too many criminals. And it will be forced to recognize that Ohio’s death penalty tends to distort the law and this court’s decisions, as well as society’s conceptions of justice and punishment.
{¶ 313} The distortions worked in this case are manifold and vitiate any claim that Jackson’s death sentence was fairly imposed. Most notably, Jackson’s *232 counsel determined, after investigation and consultation with the independent expert who had fully examined Jackson, that it was inappropriate to file a motion pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). A successful Atkins motion would have prohibited the imposition of the death penalty based on intellectual disability, but Jackson’s counsel determined that such a motion would have been unfounded and unsuccessful, and they may well have believed that even filing the motion would have worked to Jackson’s detriment. Given that the independent expert was Jackson’s primary witness in mitigation, defense counsel could reasonably have determined that requiring that same witness to testify about Jackson’s intellectual abilities in a pretrial Atkins hearing that was bound to fail would have the effect of blunting the expert testimony’s impact and therefore might well cost Jackson his life.
{¶ 314} Rather than accepting trial counsel’s strategic decision, the trial court chose to second-guess it. It sua sponte held a “reverse-Atkins” hearing to demonstrate that the trial counsel’s decision to forgo filing an Atkins motion was justified and to “build a record on why it wasn’t being done.” In short, the trial court chose to sit second chair for the defense. Admittedly, trial courts have great latitude in managing the cases over which they preside. But this hearing had one justification only: to protect a yet-to-be-imposed death sentence from reversal in a subsequent appeal. There is simply no other reason to even contemplate such a hearing, and that should give pause to any reviewing court that is concerned about the potential prejudgment of a case and the sanctity of the attorney-client relationship.
{¶ 315} In fact, a similar issue gave the trial court pause. The state filed a motion to have defense counsel’s entire trial file turned over to the court for in camera and appellate review. The trial court observed that the state’s “motion gets at the same issue that I was trying to get at with the Atkins thing, you know, build a record that the defendant has considered things, so that down the road there isn’t all this speculation whether something was done right.” But the trial court expressed far greater hesitancy on this motion and denied it. It seems that the court may have felt — correctly—that by granting such a motion it would be interfering with Jackson’s constitutional rights to present his case and be fairly defended by counsel. Why the trial court failed to recognize that the same damage occurred when the trial court adopted the role of inquisitor and caused the creation of a pretrial record on the Atkins issue is a true mystery. And while prejudice to Jackson may not be obvious from the record, the trial court’s action calls its impartiality into question. It therefore falls directly into the category of those “structural defects in the constitution of the trial mechanism, which defy analysis by ‘harmless-error’ standards.” Arizona v. Fulminante, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), citing Turney v. Ohio, 273 U.S. 510, *233 47 S.Ct. 437, 71 L.Ed. 749 (1927) (trial by judge who is not impartial is structural error that violates due process).
Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Saleh S. Awadallah and Mary H. McGrath, Assistant Prosecuting Attorneys, for appellee.
David L. Doughten and John P. Parker, for appellant.
{¶ 316} I remain even more troubled by this court’s refusal to truly engage in an independent reweighing of death sentences. Jackson’s actions, abhorrent as they are, were undoubtedly influenced by his serious alcohol and drug abuse, his low intelligence, and his troubled background. Dr. Fabian, the independent expert retained by the defense, testified that Jackson had a serious substance dependence, including regular use of cocaine, ecstasy, and opioids, and an ounce of PCP and a quarter-ounce of marijuana per day. Jackson stated that he took ecstasy and smoked PCP and marijuana just before robbing the Soap Opera Laudromat and shooting Tracy Pickryl. And he reported paranoid and delusional thoughts as a result of his PCP abuse, including auditory hallucinations and a belief that he was a werewolf. This must be combined with Jackson’s poor intelligence-test results and history of cognitive difficulties, which show that he is low functioning and on the borderline of intellectual disability. All these things taken together create a significant mitigation case, one that this court is required to independently weigh.
{¶ 317} The evidence clearly established that Jackson shot and killed Tracy Pickryl in the awful culmination of a spree of armed robberies that began two weeks earlier when he shot his friend Stanley Bentley in the side. Jackson admitted before and at trial that he had shot Pickryl but maintained that he never meant to kill her and that he had fired the gun only to scare her and that Pickryl had fallen into the line of fire and was hit in the face. This is corroborated by his testimony that he thought about killing Pickryl’s coworker Diaz because he did not want to leave any witnesses, but could not do it and instead shot over Diaz’s head to “shut her up” so he could escape. Jackson also admitted that he shot Bentley, but he claimed that it was because he believed that Bentley was about to shoot him.
{¶ 318} This is a terrible case, but it should not be a death-penalty case. I dissent.