ing the foregoing bridges, or enforcing the foregoing orders of the PUC against SEPTA.

UNITED STATES of America

v.

John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron" Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites, and William E. Rusin, Defendants.

Crim. No. 91–178.

United States District Court, W.D. Pennsylvania.

April 30, 1993.

See also 813 F.Supp. 372, 826 F.Supp. 1536, 826 F.Supp. 1533.

Thomas W. Corbett, Jr., U.S. Atty., W.D. Pa., James R. Wilson, Paul E. Skirtich, Asst. U.S. Attys., for plaintiff.

James Wymard, William Difenderfer, Ellen Viakley, Gary Gerson, Anthony Mariani, Lee Markovitz, Ray Radakovich, Stanley Greenfield, Martha Bailor, Frank W. Ittel, Jr., Raymond M. Maloney, John Zagari, Foster Stewart, Edward J. Osterman, Carl M. Janavitz, Carmen A. Martucci, Joel Johnston, John Goodrich, Vincent Baginski, Samuel J. Reich, William Acker, Joseph Kanfoush, Michael Foglia, Carl Parise, and Caroline Roberto, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

Pending before the Court is Defendant William E. Rusin's Motion to Suppress Statement of April 24, 1990 (Document No. 415). A hearing was held on July 9, 1992, at which the Court received the testimony of FBI Special Agent John Duffy ("S.A. Duffy"), Defendant Rusin ("Rusin") and John Butya, Esquire ("Butya").[1] Based upon the submissions of the parties and the preponderance of credible evidence, the Court makes the following Findings of Fact and Conclusions of Law.

### *Findings of Fact*

1. Prior to April 1990, S.A. Duffy and IRS/CID Special Agent Daniel Hanlon ("S.A. Hanlon") were conducting an investigation of a suspected illegal poker-machine gambling operation run by John F. "Duffy" Conley in the Pittsburgh, Pennsylvania area.

2. S.A. Hanlon learned from a person familiar with a certain bank that an individual named Bill had been making large cash deposits into a bank account of John F. "Duffy" Conley. The person also described Bill to S.A. Hanlon and told him that Bill was the owner of a bar in Crafton named Mugshots.

---

1. The transcript of the hearing is located at Document No. 454 of CR91–178.

3. S.A. Duffy contacted someone he knew in Crafton and asked whether the person knew Bill, the owner of Mugshots. The person responded by telling S.A. Duffy, among other things, that Bill, the owner of Mugshots, was named Bill Rusin.

4. Rusin, fifty-eight, has a ninth grade education and is unable to read or write.

5. The agents made several attempts to contact Rusin at his bar and his home, but they were not successful. Nonetheless, the agents left messages for Rusin.

6. Rusin telephoned S.A. Duffy in response to the messages. Rusin agreed to meet with the government agents. Rusin selected the place for the meeting. It was an Eat 'N Park restaurant in Robinson township, close to Rusin's residence and a place with which he was familiar. The meeting was scheduled for April 24, 1990, several days after the telephone call.

7. On April 24, 1990, Rusin attempted to contact his attorney, John Butya, Esquire. As Butya was out of the office, Rusin left a message with Butya's secretary. Further, Rusin told his wife and son to make sure that they got in touch with Butya. Notwithstanding his inability to contact Butya, Rusin went to the Eat 'N Park to meet with the agents.

8. At about 2:00 p.m. on April 24, 1990, Rusin was waiting outside the Eat 'N Park. S.A. Duffy and S.A. Hanlon drove into the parking lot in an FBI vehicle, a late-model Pontiac Bonneville. The car was a four-door, regular automobile, without special locks, screens or devices to prevent occupants of the rear seat from exiting.

9. As the agents drove towards the front door, they noticed a man who appeared to be looking for someone. They asked him if he was Bill Rusin. Rusin and the agents identified themselves to each other.

10. S.A. Duffy drove the car into a parking space. Rusin followed the car on foot to the parking space, one of the agents opened the car door for him and Rusin sat in the right rear seat. Although S.A. Duffy had the intention of conducting the interview in the restaurant, it was conducted in the car. S.A. Duffy never directed Rusin to get in the car.

11. The agents presented their credentials to Rusin. They informed Rusin of the general nature of the their investigation and that Rusin's name had surfaced in the investigation. They did not tell Rusin that he had been connected to suspected money laundering activity. The agents told him that they wanted to interview him as a potential witness and to have his cooperation.

12. The agents did not tell Rusin that he was a target of their investigation; nor did they tell him he was not a target.

13. At the time of the interview, the agents contemplated the possibility that Rusin was engaged in illegal conduct. Nonetheless, the agents had no present intention of using Rusin's statement against him.

14. The agents did not state that what Rusin said during the course of the interview would not be used to incriminate him. Rusin never asked whether his statements would be used to incriminate him and never indicated that he would not answer questions in the absence of some type of immunity.

15. The agents were not aware of Rusin's inability to read and write. There is no evidence that the agents asked Rusin to read, write or sign any document during the interview.

16. The agents never informed Rusin of his *Miranda* rights.

17. The agents never told Rusin that he had no need for an attorney.

18. Rusin never informed the agents that he did not wish to answer questions until Butya, his attorney, was present. Indeed, Rusin never informed the agents that he was expecting Butya to appear at the Eat 'N Park.

19. The agents did not tell Rusin that making bank deposits is perfectly legal.

20. The agents did not tell Rusin that no record of the interview would be made. In fact, S.A. Hanlon took notes of the interviews, and Rusin saw him "scribbling" throughout the interview.

21. The agents made no promises or threats to Rusin during the course of the interview.

22. The agents did not tell Rusin the specifics of their investigation and stressed that they wanted his cooperation because they wanted Rusin to talk to them.

23. The agents did not formally arrest Rusin at any time on April 24, 1990. So far as the agents were concerned, Rusin was free to leave at any time and free to decline to answer any question.

24. Rusin believed that he was not free to leave the car. Further, he felt intimidated being in the car and being questioned by the agents.

25. The car was hot, but Rusin did not complain about the heat to the agents.

26. The agents did not pressure Rusin to answer any questions.

27. Rusin answered the agents' questions.

28. Meanwhile, back at Butya's office, Butya returned and received Rusin's message sometime after 1:05 p.m.

29. Butya placed a call to the office of John Zagari, Esquire. As Zagari was not in his office, Butya left a message.

30. Dan Rusin, the Defendant's son, was waiting for Butya's return at his office or arrived shortly after Butya's return. Dan Rusin was excited and insisted that Butya accompany him to the Eat 'N Park to find his father. Butya and Dan Rusin left hurriedly in Dan Rusin's truck to find Rusin at the Robinson Eat 'N Park.

31. After Butya left his office, Butya's secretary received, at 2:40 p.m., a message from Zagari stating that he could be reached through his office, he was in New York and Rusin should not answer any questions unless he is granted immunity.

32. Butya and Dan Rusin looked for Rusin inside the Eat 'N Park but could not find him. They got back in the truck and drove around the parking lot in search of Rusin or his car. They didn't see either. They drove to the nearby State Police barracks, drove through the parking lot and concluded that Rusin was not there. They returned to the Eat 'N Park, where they found Rusin in the Pontiac Bonneville with the agents.

33. Butya approached the car where Rusin was answering the agents questions. After Butya and the agents identified themselves to each other, Butya joined Rusin in the back seat of the car.

34. The agents disclosed to Butya the general subject of the interview and what questioning had transpired before he arrived. Butya remained in the car until the end of the interview.

35. Butya asked if the interview was being taperecorded, and the agents told him it was not. Butya did not ask whether notes were being taken. Butya asked whether Rusin was the subject of the investigation. The agents told Butya that Rusin was not the subject of the investigation. Butya left with the impression that Rusin's statement would not be used against him.

36. Butya never complained about the heat of the car.

37. The interview continued in Butya's presence.

38. The interview lasted approximately one hour. Butya was present for the last fifteen to thirty minutes of the interview.

39. Rusin was not offered, and did not request, food or drink during the course of the one-hour interview.

### Conclusions of Law
#### Miranda Rights

40. The advisement of constitutional rights set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) is required only when a suspect is questioned while in custody. *California v. Beheler*, 463 U.S. 1121, 1123, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 494–95, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977); *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612.

41. A person is "in custody" when the police have formally arrested the person or have restricted his or her freedom of action in any significant way. *Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520; *Mathiason*, 429 U.S. at 494, 97 S.Ct. at 713; *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *cf. Michigan v. Chesternut*, 486 U.S. 567, 573, 108

S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (reiterating that a "seizure" of a person for Fourth Amendment purposes occurs only if, under the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave). Whether the police have restricted a person's freedom of action in any significant way is determined under the totality of circumstances. *Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520.

42. The Supreme Court has emphasized the following:

> [A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of the law enforcement system may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714 (emphasis in original).

■ 43. Under the totality of circumstances, Rusin was not in custody at any time on April 24, 1990. Rusin contacted the agents in response to their inquiries and voluntarily appeared at the Robinson Eat 'N Park, a location familiar to, and chosen by, Rusin. Of his own free-will, he followed the agents' car to a parking space. Rusin entered the car of his own accord and without direction from the agents. That one of the

agents opened the door for Rusin is not evidence of coercion; rather, it merely accommodated Rusin's intention, expressed by his conduct, to conduct the interview in the car. At any time, Rusin could have left the car by opening the door and stepping to the outside.

44. The agents' conduct did not restrain Rusin's freedom of action to any significant degree. Rusin's misapprehension of his ability to end the interview and leave was not objectively reasonable.

45. As Rusin was not in custody, his statements are not subject to suppression for the agents' not having advised him of his *Miranda* rights.

### Right to Counsel

46. A person's right to be represented by counsel emanates from both the Fifth and Sixth Amendments. *Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990); *Michigan v. Jackson,* 475 U.S. 625, 629–30, 106 S.Ct. 1404, 1407–08, 89 L.Ed.2d 631 (1986); *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

■ 47. The Fifth Amendment-based right to counsel does not require government agents to advise a person of his or her right to have counsel present during questioning or to furnish the person with counsel, unless the person is "in custody." *Beheler,* 463 U.S. at 1123, 103 S.Ct. at 3520.

■ 48. The Sixth Amendment-based right to counsel is not implicated until the government institutes formal, judicial, adversarial proceedings against a person. *Compare Jackson,* 475 U.S. at 629–30, 106 S.Ct. at 1407–08, *and Kirby v. Illinois,* 406 U.S. 682, 688–90, 92 S.Ct. 1877, 1881–83, 32 L.Ed.2d 411 (1972).

■ 49. The agents did not elicit Rusin's statements in violation of his right to counsel. Rusin was not in custody when he made his statements to the agents, and no formal judicial proceedings had been instituted against him by April 24, 1990.[2]

---

**2.** As the Court found as fact that Rusin did not inform the agents that he wished to have counsel

present and the agents did not tell Rusin that he had no need for counsel, the Court does not need

Voluntariness

■ 50. Statements that were not obtained in violation of a person's *Miranda* rights or right to counsel are nonetheless subject to suppression as violative of due process if they are "coerced" or "involuntary." *See, e.g., Arizona v. Fulminante,* 499 U.S. 279, ——— ———, 111 S.Ct. 1246, 1253–54, 113 L.Ed.2d 302 (1991); *Lego v. Twomey,* 404 U.S. 477, 483, 92 S.Ct. 619, 623, 30 L.Ed.2d 618 (1972); *Miller v. Fenton,* 796 F.2d 598, 603 (3rd Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). While it is the government's burden to show by a preponderance of the evidence that the challenged statements are voluntary, *Lego,* 404 U.S. at 489, 92 S.Ct. at 626, the ultimate issue of voluntariness is a question of law for the court. *Fulminante,* —— U.S. at ——, 111 S.Ct. at 1252.

■ 511. "It is well established that an involuntary confession may result from psychological, as well as physical, coercion." *Miller,* 796 F.2d at 603–03 (citing cases). Whether a confession is voluntary is determined under the totality of the circumstances. *Fulminante,* 499 U.S. at ——— ———, 111 S.Ct. at 1251–52. In making its assessment, a court should look to the following:

> the youth of the accused; his lack of education or his low intelligence; the lack of any advise to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as deprivation of food or sleep.

*Miller,* 796 F.2d at 604 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)). The court should consider the tactics employed by the government, the details of the interrogation and the specific characteristics of the accused. *Id.* The focus of the inquiry is the person's "ability to make an unconstrained, autonomous decision to confess." *Id.* 796 F.2d at 605.

■ 52. Rusin's statements to the agents on April 24, 1990 were not coerced.

53. Rusin was not detained or in custody; he voluntarily met the agents at the Eat 'N Park, entered their car and answered their questions. The Court has found as fact that Rusin did not, at any point in the interview, decline to answer the agents questions for any reason. *Cf. Miller,* 796 F.2d at 601–03.

54. At fifty-four, Rusin is not youthful. Although Rusin has only a ninth-grade education and cannot read or write, the lack of these skills was not any great handicap to him during the interview. He was not asked to sign or read any document. The agents were interested in facts within his personal knowledge.

55. It is undisputed that the agents did not advise Rusin of his constitutional rights. Rusin's seeking the advice and presence of counsel of at least one of his counsel before the interview indicates that he had some knowledge of the utility of having counsel at the interview. Yet, he attended the interview as scheduled, without counsel, and he never requested that the interview await the arrival of counsel. Indeed, he never mentioned counsel until Butya arrived at the car. In assessing voluntariness, the Court does not give great weight to the agents' failure to advise Rusin of his rights prior to the non-custodial interview.

56. Rusin was not "detained" during the interview. Moreover, the interview lasted approximately one hour, and Rusin was represented by counsel at the interview for fifteen to thirty minutes. The agents may have repeated certain questions. The car was hot, but not oppressive. The Court concludes that, in intent and effect, the length and nature of the interview is not indicative of coercion.

57. Rusin suffered no physical punishment or deprivation. During the one-hour interview in the mid-afternoon, Rusin did not request either food or drink. Both were readily available at the Eat 'N Park, in whose parking lot the interview occurred.

to address whether a defendant has a constitutional right to the presence of his independently retained counsel at a noncustodial interview. Likewise, the Court does not need to address the

effect of government agents' continuing to question a suspect who has requested the presence of such counsel on the issues of custody and voluntariness.

58. S.A. Duffy and S.A. Hanlon did not engage in tricks and subterfuge relative to this interview. They made no promises or threats to secure Rusin's cooperation. The agents did not disclose to Rusin all they knew; they were under no duty to do so. Although the agents most assuredly had at heart the best interests of their investigation, rather than Rusin, the conduct of the agents was not coercive or deceptive. *Cf. United States v. Velasquez*, 885 F.2d 1076, 1088 (3d Cir.1989), *cert. denied*, 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990) (police deception, under the circumstances, did not make statement involuntary); *Miller*, 796 F.2d at 607 (same).

59. Rusin's statements to S.A. Duffy and S.A. Hanlon on April 24, 1990 were not the product of an overborne will. They were not "coerced" or "involuntary" within the meaning of due process.

60. For the foregoing reasons, Rusin's Motion to Suppress Statement of April 24, 1990 will be denied.

See also 813 F.Supp. 372, 826 F.Supp. 1527, 826 F.Supp. 1536.