Filed 3/8/16  P. v Preciado CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062897 |
| v. | (Super.Ct.No. FWV1301819) |
| DANIEL EDUARDO PRECIADO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Gerard S. Brown, Judge.  Affirmed.

Daniel Eduardo Preciado, in pro. per.; Ron Boyer, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

**FACTUAL AND PROCEDURAL HISTORY**

A.     PROCEDURAL HISTORY

On December 2, 2014, a second amended information charged defendant and appellant Daniel Eduardo Preciado with three counts of violating Penal Code[1] section 288, subdivision (b)(1) (forcible lewd act upon child), and three counts of violation of section 288, subdivision (a) (lewd act upon child).  After a seven-day jury trial, the jury acquitted defendant of the three counts of violating section 288, subdivision (a), and convicted him of three counts of violating section 288, subdivision (b)(1).

On February 6, 2015, the trial court sentenced defendant to the upper term of 10 years on each count, and imposed full-term, consecutive sentences under section 667.6, for a total term of 30 years.

On the same day, February 6, 2015, defendant filed a notice of appeal.{CT 156}

B.     FACTUAL HISTORY

Defendant was born on December 16, 1992.  He has two younger sisters:  Jane Doe, born in May 2001; and K.P., born May 2004.

Between the last week of October 2012 and the last week of April 2013, defendant and his two sisters were living at his father's house.

During trial, Doe testified that defendant twice touched her vagina.  She testified that the first time was in a "bad way."  She stated that she did not recall whether the second time was in a "bad way."  Doe testified that at the time of trial, there were many

---

[1] All statutory references are to the Penal Code unless otherwise specified.

aspects of those events that she did not recall. She felt it was her fault that defendant was in jail. She loved defendant and wanted him out of jail.

K.P. testified defendant touched Doe in a bad way. The three of them had been watching television. Defendant got on top of Doe and held her down on the couch. Doe cried. K.P. tried to push defendant off; she told defendant to stop. K.P. then went to tell her parents but Doe stopped her and told her not to tell. K.P. testified that this was the only time she saw defendant touch Doe in a bad way. K.P. did not remember a second incident. Also, she did not remember what she had previously said about these events. K.P. felt it was her fault that defendant was not at home.

In May and June of 2013, on different days, Doe and K.P. were interviewed by Kyra Dotter, a forensic interviewer at San Bernardino County Children's Assessment Center. In an interview on May 2, 2013, Doe told Dotter that defendant had raped her the previous October or November. Doe stated that she, K.P. and defendant had been fake wrestling and watching television. At some point, defendant unbuckled Doe's pants, pulled her pants and underwear down, and "did it." Doe told him to stop because it was hurting her. Defendant was holding her wrists and arms in a way that hurt her. With his other hand, he opened Doe's vagina and put his penis in.

While this was happening, K.P. was punching and kicking defendant and telling him to get off. Doe told Dotter that she tried to scream but defendant covered her mouth. Doe then bit defendant's hand. Defendant told her that if she bit him again, "he would put it all the way in." Doe said that she then went to the restroom and saw some white

3

stuff. Doe recalled describing to Dotter, that around Halloween of 2012 defendant put his penis in her vagina.

Doe told Dotter that defendant raped her again two weeks later. On this occasion, defendant dropped Doe onto the floor, pulled her pants and underwear down, and covered her mouth. Defendant "put it in and out" three quick times and then left. Doe said, "Then after that he just got up, put me on the floor crying, and he was like watching TV like nothing ever happened." Doe slapped defendant and said, "I don't want you touching me," "I don't want you near me if that's what you're going to be doing." Doe took a shower; there was a "little white stuff" coming out of her vaginal area.

Doe told Dotter that there was a third occurrence about three weeks prior to the interview. Defendant gave Doe a hug. Defendant then started to reach up into Doe's shorts. His hands went up her leg in a way that felt like a spider. Doe yelled and screamed, "Help, help," and "Stop." Defendant said that he would not do it again, but he wanted to see her vagina. Doe said "No," and defendant reached into his pants. He said, "If you don't let me see it, I'm going to rape you again." Defendant reached up from below into Doe's shorts and moved her underwear to the side as he was reaching into his own pants. Doe kicked defendant and ran from the room screaming for her sister. The following Monday, Doe told her best friend about what had occurred. Her friend's mom called Doe's school. Doe then told her principal that defendant had raped her.

On June 26, 2013, K.P. was interviewed by Dotter. K.P. told Dotter that while she, Doe and defendant were watching television, defendant pulled his "chonies" down and "he put his thing in [Doe]." At the time, Doe was crying and yelling at defendant to

4

stop. K.P. was trying to help Doe to get defendant off of her; K.P. pushed on his shoulder. K.P. told Dotter that defendant did not stop. Defendant then hit K.P. and she fell back. Defendant stopped when he saw that K.P. was going to go to tell the parents. As K.P. was running, she fell down. Doe then caught up with K.P. and told Doe not to tell the parents because she was scared they were going to get mad at Doe. K.P. told Dotter, "So then I didn't tell them because I didn't want her to feel like she couldn't trust me."

K.P. told Dotter that "this" happened between defendant and Doe occurred four times; K.P. observed it three times. K.P. said that she had seen the second, third and fourth incidences. K.P. stated that the third and fourth times were like the second time. Each time, K.P. tried to push or pull defendant away from Doe. K.P. stated that Doe told her "to not tell no matter what happened."

K.P. told Dotter that the first time was during the fireworks for the fourth of July. K.P. said Doe had been walking to the kitchen when defendant "just grabbed her like out of nowhere and then put his finger in there." Doe ran to K.P.'s room crying.

On May 28, 2013, defendant was interviewed by Sergeant Nick Marotta of the Chino Police Department. Defendant was advised of his *Miranda*[2] rights; he stated he understood them. The interview was recorded.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

Initially in the interview, defendant denied any kind of sexual activity. Later in the interview, however, defendant stated that he had engaged in consensual sexual activity with Doe. Defendant stated that on three occasions, Doe came to where he was sleeping and initiated sex. Defendant stated that once he realized what was happening, he pushed Doe off.

During the interview, defendant stated there was a fourth occasion when both Doe and K.P. were on top of him holding him down. They had been wrestling together. Defendant stated that Doe had been acting up, running around, and trying to grab his penis. He said that Doe took her pants off and climbed on top of him. Later in the interview, defendant said that on that date, of his own free will, he put his penis in Doe's vagina. He said that Doe told him, "come on, come on, come on," and opened her legs up, and guided his penis into her vagina. Defendant said that he thrust once, realized it was a mistake, and moved out. Defendant said that he put his penis in Doe's vagina a total of four times.

During trial, defendant testified that he had denied the crimes in the interviews. However, when Detective Marotta kept asking the same question over and over, he felt pressured to say something that agreed with the detective. Defendant testified, "I told [the detective] what he wanted to hear so he would leave me alone." The interview was four or five hours long. Defendant stated he had made up the statements during the interview about his penis being in Doe's vagina. Defendant thought that if he told the detective that he had sexual intercourse with an 11-year-old, the detective would let

6

defendant go. Defendant that that if he told the detective defendant did not "do it, [he] would have to stay here indefinitely."

Defendant testified that he never touched Doe. Defendant could not explain why Doe and K.P. told Dotter something different.

Itzel Matus had known defendant for eight years. They had two children together. At the time of trial, one of the children was three years old and the other was 14 months. Defendant and Matus met with she was 13 years old. They started dating when she was 16 years old. Although they were not legally married, Matus referred to defendant as her husband because he was the father of her daughters and they lived together. Matus had never seen defendant be attracted to children or do anything inappropriate with children. They had not discussed or acted out any fantasies of that kind. Matus testified that defendant did not have a reputation for being inappropriate with children or touching them in any way.

## DISCUSSION

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 setting forth a statement of the case, a summary of the facts, and potential arguable issues, and requesting this court to undertake a review of the entire record.

We offered defendant an opportunity to file a personal supplemental brief, and he has done so. On January 27, 2016, defendant filed a 23-page handwritten brief with an attached "excerpt of record."

7

In his brief, defendant essentially challenges the sufficiency of the evidence to convict defendant pursuant to section 288, subdivision (b)(1) (forcible lewd act upon a child). In support of his argument, defendant challenges the testimonies given by the witnesses at trial. For example, defendant claims "there wasn't enough probative material evidence (DNA). Jane Doe's statements of proof that her pain vagina resulted from allegedly sex intercourse preformed by the defendant's penis such theory is invalid." (*Sic.*)

Moreover, defendant argues that the prosecutor, in asking a nurse whether the cleft found on Doe was consistent with an 11-year-old child having sexual intercourse was improper, because the nurse was an expert witness for the prosecutor. "It is wherefore, that nurse's statement given to the consistent factor of sex intercourse against the defendant should not has been worthy of full belief it doesn't have substantial lawful merit at al per (DNA's) essence, did not even were introduced there documented data showing likeness as to how many kids by the same age as Jane Doe or so has been injuryed likewise by their one's ownself fingering or by unknown instruments, there were introduced nothing which could have turned off what the defense argued" (*Sic.*) Defendant goes on to argue that Doe had caused the cleft by herself and blamed it on defendant "to not be reprehended by her parents." (*Sic.*)

Defendant challenges Doe's credibility by stating it is unlikely for her not to have bleeding if she were truly raped. He goes on to challenge why Doe would not have told her parents—he states that it is unlikely that an 11-year-old child would have gone to the bathroom after the incident instead of seeking the comfort of her parents. Defendant also

challenges the examination done by Montclair Hospital on Doe.  Defendant goes on to question the credibility of Doe and K.P.  The jury heard this testimony, weighed it, and resolved any conflicts in the evidence.  On appeal, "we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses."  (*People v. Cortes* (1999) 71 Cal.App.4th 62, 71.)

Based on our review of the evidence, we hold that substantial evidence supports defendant's convictions under section 288, subdivision (b)(1).

Moreover, in his personal brief, defendant seems to be challenging the interrogation techniques of the detective who interviewed defendant.  In essence, defendant argues that the officer's repeated questions made defendant confess to a crime he did not commit so he could "walk home."  We have reviewed the record and find no evidence of coercion by the officer.  Even if we were to assume that defendant's confession was coerced and the court erred in admitting the statement, we review such error "in the context of other evidence presented" to determine whether the admission of his statement was harmless beyond a reasonable doubt.  (*Arizona v. Fulminante* (1991) 499 U.S. 279, 308.)  Here, there was overwhelming evidence—without defendant's confession—to support defendant's convictions.  Therefore, we find any alleged error to be harmless beyond a reasonable doubt.

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have conducted an independent review of the record and find no arguable issues.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

J.

We concur:

RAMIREZ _____

P. J.

McKINSTER _____

J.