Filed 10/25/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>VERNON LEE HAMPTON,<br><br>    Defendant and Appellant. | A165957<br><br>(San Francisco County<br>Super. Ct. No. SCN 230484) |

    Within weeks after defendant Vernon Lee Hampton left his employment at a San Francisco restaurant, the restaurant was robbed by a person in disguise. Hampton was charged in connection with the crime, and a jury convicted him of felony counts of second degree robbery and false imprisonment, acquitted him of accompanying firearm enhancements, and hung on lesser weapon enhancements. The trial court suspended imposition of the sentence and placed him on probation for three years.

    This appeal concerns unusual circumstances related to the jury deliberations. Before closing arguments, which took place in January 2022, the trial judge dismissed two jurors for reasons related to COVID-19 and seated the two remaining alternate jurors. After the jury began deliberating, the judge was called away by a personal emergency, and another judge took her place. Subsequently, one of the remaining jurors tested positive for COVID, and Hampton moved for a mistrial, contending that the original judge had made an off-the-record ruling prohibiting any remote deliberations.

1

After consulting with the original judge, the substitute judge denied a mistrial. The substitute judge then permitted the juror who had COVID to deliberate remotely for one day, at the end of which the jury returned its verdicts. The foreperson disclosed that the jury reached agreement on the verdicts while all the jurors were present in person, meaning that during the remote deliberations the jury discussed only the lesser weapon enhancements on which it hung.

On appeal, Hampton contends that (1) the substitute judge improperly relied on ex parte communications with the original judge in denying a mistrial and (2) the jury deliberations in which one juror participated remotely were unauthorized and unconstitutional. He further contends that these errors are structural, meaning they are reversible without a showing of prejudice. We reject these contentions. We conclude that the judges' communications were ethical and did not deny Hampton a fair trial. We also conclude that any error in permitting the jury to deliberate remotely for one day was harmless because, as the record establishes, that day of deliberation did not result in a finding of guilt. Accordingly, we affirm the judgment.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Background

In July 2014, Hampton began working as a manager at the Rainforest Cafe, a restaurant in the Fisherman's Wharf area that occupied several floors of a large building. Each of the restaurant's managers had a set of keys to various interior and exterior doors, including the door of the manager's office and the building's exterior door on Mason Street. Rainforest Cafe employees were supposed to use the Mason Street door to enter and exit the building.

2

That door had a keypad to which all employees had the code, and the managers "typically . . . never used" their physical keys to open it.

The Rainforest Cafe's general manager supervised the other managers and scheduled their shifts. Any manager could close the restaurant on a given night, and they all knew how to perform the closing manager's duties. The closing manager was the last to leave and was responsible for locking the doors that led from the building's interior stairwell to the restaurant. The closing manager's duties also included totaling the day's proceeds and preparing the cash for pickup by an armored car. The cash was picked up twice a week, on Mondays and Fridays.

In 2015, about a year into his employment, Hampton asked for time off over the July 4 holiday weekend. After the general manager denied the request, Hampton stopped going to work. Hampton came to the restaurant later in July to pick up his final check, but he did not return his set of keys to the restaurant. As part of the standard policy whenever a manager left, the restaurant's locks were immediately changed. But after Hampton's employment ended, although the code on the keypad of the Mason Street door was changed, the physical lock was not.

B.     *The Robbery*

Around 1:00 a.m. on Friday, August 28, 2015, another manager, E.S., was in the manager's office. As was usual, the door to the manager's office was open. E.S. was sitting in a rolling chair, finishing paperwork, when someone wearing a red motorcycle helmet came up behind him and put their arm around his throat.

The person wheeled E.S. to the safe where the cash was kept, and "made a hand gesture" indicating E.S. should open it. E.S. responded that the safe was time-locked and could not be opened, which was untrue. The

3

person then produced "a silver pistol," cocked it, and "tapped the safe to . . . indicate that they knew the safe opened." E.S., who was not familiar with guns, testified that he could not be sure whether the pistol was real or operable. Nonetheless, he was frightened, and he opened the safe, which contained almost $9,000.

The person then rolled E.S. to a corner of the manager's office, bound his arms, and placed a shirt over his head. It seemed to E.S. that the person was "really slow" and "took their time when they tied [him] up," which was not done "aggressive[ly]." After several minutes during which E.S. could hear "rummaging," the person left, having "never said a word." E.S. was eventually able to free himself and call 911. After doing so, he realized that the cash was missing from the safe.

C.     *Surveillance Footage and Other Evidence*

The Rainforest Cafe had a surveillance system covering much of the restaurant, including hallways and the manager's office. Recordings from the night of the robbery, which the general manager reviewed with the police, showed a "very stocky, mus[cl]y" person "[w]earing dark clothing, in a motorcycle helmet with a dark shield, so you could not see the face," enter the building through the Mason Street door. The person proceeded to the third floor and into the manager's office, where the robbery occurred.

The general manager testified that it struck him "[h]ow calmly and slowly the person . . . came in the building and how familiar it appeared to be to them," as they "kn[ew] exactly where to go to commit the armed robbery, where the money would be and on what floor." The general manager also observed that the person's "walk and body style" were similar to those of Hampton, whom the general manager described as a "very clean, crisp, very mus[cl]y man, very, very strong powerful man." Similarly, E.S., who was

4

friends with Hampton, testified that Hampton was "in good shape" and "definitely of muscular build."

A nearby business's surveillance footage showed the suspect, wearing a red motorcycle helmet, enter a white four-door sedan soon after the robbery. At the time, Hampton and his wife had a similar car, a white Nissan Altima.

Based on the robber's appearance and familiarity with the building, the general manager suspected the robber was Hampton. After forming this suspicion, the general manager watched surveillance footage from the previous Monday morning, August 24, 2015, at the end of the last night shift before pickup of the weekend receipts later that day. The footage showed a person enter the building through the Mason Street door, check the hallway doors and, finding them locked, turn around and leave. A Rainforest Cafe cook testified that around 1:00 a.m. on that morning, he was outside the restaurant with friends and saw Hampton walking back and forth. The cook then saw Hampton leave in a white four-door sedan.

The prosecution also presented evidence obtained from Hampton's cell phone. Hampton sent incriminating text messages to another man leading up to and immediately after the robbery. In addition, other text messages indicated that Hampton paid two significant debts shortly after the robbery occurred. No physical items tying Hampton to the robbery were ever recovered, however, including the gun, the stolen cash, or the red motorcycle helmet.

### D. Hampton's Testimony

Hampton denied ever using his keys or the keypad code to enter the Rainforest Cafe after leaving his employment. He specifically denied robbing the restaurant or entering the building four days beforehand, although he admitted he was the person the cook saw on the earlier occasion. He claimed

5

that he often went to the Fisherman's Wharf area to hang out with his friends from the restaurant business, including the man whom he texted around the time of the robbery.

### E.      Procedural History

Hampton was charged in September 2015, but the preliminary hearing did not occur until over three years later. In January 2019, an information was filed charging Hampton with two felonies, second degree robbery and false imprisonment. It was also alleged that he personally used a firearm during both offenses.[1] Later, the prosecution added a lesser allegation as to both counts that Hampton personally used a deadly or dangerous weapon.[2]

Trial began in December 2021, with Judge Christine Van Aken presiding. On December 23, the court recessed for the holidays. When the jury returned on January 5, 2022, Judge Van Aken noted that one juror was absent because of a COVID exposure. She provided rapid tests to the remaining jurors, and one of them tested positive and left at the judge's request. The judge then seated two alternate jurors, leaving no more alternates.

The defense rested later on January 5, and after closing arguments, the jury started its deliberations shortly before the end of the day. The jury continued to deliberate on January 6 and 7. On the afternoon of January 7, a Friday, Judge Van Aken was absent because of a personal emergency, and

---

[1] The charges were brought under Penal Code sections 211 (robbery) and 236 (false imprisonment). The firearm-use allegations were made under Penal Code sections 12022.53, subdivision (b) (robbery count), and 12022.5, subdivision (a) (false-imprisonment count). All further statutory references are to the Penal Code.

[2] The deadly-weapon allegations were made under section 12022, subdivision (b)(1).

6

Judge Christopher Hite appeared in her place. The same day, Juror No. 6 reported that his wife had tested positive for COVID.

On Monday, January 10, Judge Hite met with the parties to discuss Judge Van Aken's absence.[3] Judge Hite explained that Judge Van Aken could not handle the remainder of the case and he would be "taking jurors' notes, responding to them, and eventually taking a verdict" but would not "engage in any other aspect of the trial." He indicated that he had consulted with Judge Van Aken about "additional circumstances that have arisen in this case" and had access to her to discuss any issues involving the verdicts.

After overruling the defense's objection to his substitution for Judge Van Aken, a ruling that is not at issue, Judge Hite turned to the fact that Juror No. 6 now also had COVID. Judge Hite had "consulted with Judge Van Aken" and "the supervising judge" about what to do if this juror tested positive. He tentatively ruled that the jury's deliberations would stop until two days later, January 12, the earliest day under public health guidelines that the juror could return to court in person. If the juror then tested negative, deliberations would resume, but if he tested positive, Judge Hite would "address with the parties what to do at that point[,] including the potential for a mistrial."

Hampton's trial counsel objected to the two-day continuance. As background, she explained that the juror who was replaced after testing positive on January 5 originally reported he had COVID on December 30, while he was in Hawaii. At the parties' request, Judge Van Aken delayed the

---

[3] The prosecutor who tried the case had just left the San Francisco District Attorney's office for a new job, and beginning on January 10 a substitute prosecutor appeared for the People.

jury's return from the holidays by one day, to January 5, to permit that juror to return home.

Defense counsel reported that she and the original prosecutor "had a colloquy and . . . conversation over text messages and e-mails about whether or not [they] would agree to have . . . [the juror who tested positive for COVID in Hawaii] Zoom in for the closing or . . . have him Zoom in for deliberations. And both offices at that point—running up this issue with management— ha[d] decided that we are against it." According to defense counsel, once the parties told Judge Van Aken that they opposed "virtual deliberations, she did not further [discuss] the issue of having the jurors possibly deliberate on Zoom." When the same juror tested positive in court on January 5, "there [were] no other discussions with counsel about whether or not we should continue the case so that [he] . . . [could] come back after he tests negative." Instead, Judge Van Aken "excused him immediately," as well as the juror exposed to COVID.

Turning to the instant circumstances, defense counsel argued that Judge Hite's tentative ruling was "different" from and "inconsistent" with Judge Van Aken's decisions about "other jurors who tested positive in this case." Therefore, counsel objected "to any continuances and remote deliberations." She also noted the difficulty of ensuring a remote juror was deliberating under "controlled circumstance[s]," including not being able to access the Internet, and the importance of ensuring the jurors' "physical access to all of the evidence in this case[,] which includes blowups, videos, and photographs." After the substitute prosecutor argued that a two-day continuance was reasonable, Judge Hite continued the case to January 12.

On January 12, Juror No. 6 reported that he had tested negative for COVID but his wife was still positive. At Judge Hite's direction, he did not

8

come to court. Instead, Judge Hite ordered that the juror would deliberate by Zoom that day while the rest of the jurors were together at court. The judge gave special instructions on how the process should occur given that one juror would be remote, including directing the other jurors that they should not deliberate outside that juror's presence or treat him differently. The remote juror was instructed to seclude himself in a locked room and not communicate with anyone else besides the other jurors.

After the jurors retired to deliberate, the defense moved for a mistrial. Hampton's trial counsel took the position that Judge Hite should have granted a mistrial on January 10, when Juror No. 6 was unable to come to court because he had tested positive. She argued that a mistrial was now warranted based on "the absence of Judge Van Aken," which resulted in Judge Hite's making "substantive rulings" that conflicted with Judge Van Aken's rulings.

In particular, defense counsel claimed that Judge Van Aken had already determined that remote deliberations would not occur. Defense counsel represented that when the issue of remote deliberations first came up after the juror in Hawaii tested positive for COVID, "the DA's office had represented to the Court through [the original prosecutor] . . . that they [were] objecting to any kind of virtual deliberations . . . because they said that there is no case law authority and no precedent . . . to do so." Defense counsel agreed that there was no such authority and said that as far as she knew, "in the entire State of California there [are] no criminal trials . . . [or] deliberations being conducted virtually." According to defense counsel, after "the conversation about virtual deliberations and how both offices were going to object to [them], Judge Van Aken already ruled that we would no longer seek those alternatives."

9

Defense counsel also addressed the off-the-record discussions between the parties and Judge Hite.  According to her, on January 10, before Judge Hite granted the two-day continuance, she objected to virtual deliberations, and the substitute prosecutor "represented to the Court that . . . she checked with her office again and they [were] still objecting to virtual deliberations." Counsel also claimed that during another off-the-record discussion earlier on the current morning (January 12), Judge Hite indicated he planned to have Juror No. 6 deliberate remotely "because the People are not objecting."  When defense counsel corrected him by saying that as of January 10 the substitute prosecutor said the District Attorney's office was still objecting, Judge Hite responded that he would not allow virtual deliberations if both parties objected and would instead grant a mistrial.[4]  Defense counsel claimed that once the substitute prosecutor heard that Judge Hite would grant a mistrial if both parties objected to virtual deliberations, the substitute prosecutor "changed her mind" and no longer objected.

Finally, defense counsel raised the issue that because of various jurors' unavailability, the current day, January 12, was the only day left for deliberations.  Pointing to the fact that the jurors had asked whether they could deliberate through lunch, defense counsel voiced the concern that the jury would "come back with a rushed decision."

The substitute prosecutor, who had discussed the issue with the original prosecutor, first addressed the proceedings on January 5, when Judge Van Aken dismissed two jurors.  The substitute prosecutor's

---

[4] Judge Hite later disagreed with defense counsel's characterization of his response, stating that although he did "informally indicate that if both parties were going to be objecting to virtual deliberations [then he] would be inclined to grant a mistrial," he never made a formal ruling.

10

understanding was that "[t]he People . . . were not objecting to virtual proceedings at that point," although they "agreed with the defense at that time that that was not the way [they] wanted to proceed." She argued that circumstances were different then "because there was still an alternate available to take the place of each juror who was excused without objection at that time." Now, however, "[t]he jurors ha[d] already deliberated for several days in person all together" and had "indicated that they were already quite close to a verdict." The substitute prosecutor also argued that remote deliberations were authorized by law and could be conducted effectively.

Judge Hite denied Hampton's motion for a mistrial. He found that "under the exceptional and extraordinary circumstances caused by the global pandemic and specifically the positive COVID test results of Juror [No.] 6 and his wife," there was good cause to continue the jury deliberations to January 12. Based on the same circumstances, the judge also found good cause to permit that juror to deliberate remotely, which would neither prejudice Hampton nor violate due process. Although Judge Hite did not think "it would be appropriate to have virtual deliberations occur from the beginning," they were warranted because the jury had already deliberated in person two days, which "was a good amount of time" given the relatively small amount of evidence.

Judge Hite then disclosed that he "had consult[ed] with Judge Van Aken regarding previous discussions that occurred that were not on the record. She did indicate that those discussions occurred, but that it was not a formal ruling on the record with regards to virtual deliberations and certainly it was not a ruling that was made under the same circumstances . . . which we have now where there [have] been deliberations that have already occurred . . . [and] only one juror would be deliberating virtually." Judge Hite

11

"ha[d] also consulted with [Judge Van Aken] regarding virtual deliberations," and she was "in support of" Juror No. 6 deliberating with the other jurors. Thus, although Judge Van Aken "never made a ruling" about remote deliberations, Judge Hite's decision to permit them was "not inconsistent with her position regarding the case."

Later on the afternoon of January 12, the jury submitted a note asking how to proceed if it could not agree on the lesser weapon enhancements. Judge Hite directed the jury to fill out the verdict forms for the charges on which it agreed and leave blank the forms for the charges on which it could not agree.

With Juror No. 6 appearing by Zoom, the jury returned to the courtroom with verdicts of guilty for both charged offenses and not guilty for the firearm allegations. The jurors were individually polled, and they all confirmed the verdicts were correct. Under questioning from Judge Hite, the jury foreperson indicated that the jury "reach[ed] a unanimous decision" as to all the guilty and not guilty verdicts when they were all still deliberating in person. She also agreed that the jury was "hopelessly deadlocked" on the lesser weapon allegations. Judge Hite then declared a mistrial on those allegations, and they were dismissed.

Sentencing was originally set for February 2022, after Judge Van Aken returned, but was ultimately continued until that June. Before sentencing, Hampton filed a motion for a new trial. He argued that the ex parte communications between the two judges violated due process; the remote deliberations were unauthorized under California law; and the remote deliberations violated his rights to due process, a fair trial, and an impartial and unanimous jury. In particular, Hampton claimed that "virtual deliberation [was] structural error and prejudicial per se," since it created

12

doubt about "whether 12 jurors rendered a unanimous verdict . . . after a deliberative process that comport[ed] with what our framers envisioned."

In a declaration accompanying the motion, Hampton's trial counsel averred that on or around January 3, 2022, she and the original prosecutor "informed the court, by email, that [they] would not agree to virtual deliberations. [They] proposed a wait-and-see approach to a juror who had been exposed[,] as opposed to virtual deliberations which neither party would acquiesce to. In response, Judge Van Aken replied that the approach presented by both parties was a 'reasonable course.'" These emails were attached to the declaration. Defense counsel also averred that around January 5, the parties and the judge "confirmed . . . [that] both offices are opposing virtual deliberations. Judge Van Aken never brought up the prospect of virtual deliberations again after both sides' opposition."

In a written order, Judge Van Aken denied the motion for a new trial. On the issue of ex parte communications, she concluded that "a discussion of the procedural history of the case to enable Judge Hite to step in and preside effectively over jury deliberations and a receipt of a verdict" comported with ethical rules and did not constitute judicial misconduct. She also concluded that even if the communications were impermissible, they were not so prejudicial that they denied Hampton a fair trial.

On the issue of remote deliberations, Judge Van Aken concluded that "under the unique circumstances presented" they comported with state law and "did not abridge Mr. Hampton's constitutional rights or prejudice him." She determined that the Judicial Council's Emergency rule 3 authorized remote deliberations. She also determined that Hampton "receive[d] the benefit" of "the key procedural feature of a deliberating jury," namely "full and free discussion among all twelve jurors, relying only on the evidence

13

received at trial." Judge Van Aken did, however, agree with Hampton that if the remote deliberations had violated "the federal and state constitutional jury trial guarantees," then "that error [would be] structural and require[] a new trial."

## II.
### DISCUSSION

#### A.    *Standard of Review*

Hampton claims that Judge Hite erred by denying the defense's motion for a mistrial based on improper ex parte communications with Judge Van Aken about remote deliberations. Hampton also claims that the remote deliberations were unauthorized under California law and violated his constitutional rights. Hampton argues that Judge Van Aken therefore erred when she denied his motion for a new trial.

A new trial is warranted if the trial court "has erred in the decision of any question of law arising during the course of the trial." (§ 1181, subd. (5).) Generally, we review the denial of a new trial for an abuse of discretion. (*People v. Hoyt* (2020) 8 Cal.5th 892, 957.) But where, as here, the issues primarily involve questions of law, our review is de novo. (*People v. Ramirez Ruiz* (2020) 56 Cal.App.5th 809, 831.)

#### B.    *The Two Judges' Communications Were Proper and Did Not Violate Hampton's Constitutional Rights.*

Hampton claims that Judge Hite and Judge Van Aken's discussion of the issue of remote deliberations violated a judicial canon limiting ex parte communications between judges. According to Hampton, his federal and state "constitutional right to be present and represented by counsel at all critical proceedings" was violated when Judge Hite relied on these improper communications to deny a mistrial. We are not persuaded.

14

Under the California Code of Judicial Ethics, "[a] judge shall not initiate, permit, or consider ex parte communications, that is, any communications to or from the judge outside the presence of the parties concerning a pending or impending proceeding," with specified exceptions. (Cal. Code Jud. Ethics, canon 3(B)(7).) One such exception is that "a judge may consult with other judges," except other judges who have or would be disqualified from hearing the case or might participate in appellate review of the case. (*Id.*, canon (3)(B)(7)(a).) "In any discussion with [other] judges . . . , a judge shall make reasonable efforts to avoid receiving factual information that is not part of the record or an evaluation of that factual information. In such consultations, the judge shall not abrogate the responsibility personally to decide the matter." (*Ibid.*) Judges are also authorized to "initiate, permit, or consider ex parte communications, where circumstances require, for scheduling, administrative purposes, or emergencies that do not deal with substantive matters," so long as it is reasonable to believe no party will gain a resulting advantage and all parties are notified of the communications and given an opportunity to respond. (*Id.*, canon (3)(B)(7)(b).)

Hampton contends that when Judge Hite asked Judge Van Aken about the off-the-record discussions between her and the parties, "he was not engaging in a discussion of an administrative issue, but deciding a factual question that was central to [the] mistrial motion." According to Hampton, this factual question was the substance of the previous off-the-record discussions about remote deliberations, which in turn affected whether Judge Hite could permit remote deliberations without "contradict[ing] the order of an earlier judge on the matter." As Hampton points out, the general rule is that one superior court judge " ' "cannot enjoin, restrain, or otherwise interfere with the judicial act of another [judge or] department of the superior

15

court," ' " which "prevents a trial court judge from acting as a ' "one-judge appellate court" over another judge.' " (*People v. Waldon* (2023) 14 Cal.5th 288, 306.)

We do not hesitate in concluding that Judge Hite and Judge Van Aken's communications were proper. Canon 3(B) of the Code of Judicial Ethics broadly authorizes a judge to consult with another judge, with exceptions that are not relevant. (Cal. Code Jud. Ethics, canon 3(B)(7)(a).) Although the canon cautions that a judge should "avoid receiving factual information that is not part of the record" (*ibid.*), the communications at issue were not about such information. Rather, Judge Hite properly consulted with Judge Van Aken to determine the substance of her previous *ruling*, if any, about remote deliberations. Defense counsel's recollection of a ruling that did not appear on the record did not create a factual dispute about which Judge Hite could not consult Judge Van Aken. If anything, the judges' consultation benefitted Hampton since his counsel's failure to ensure the purported ruling was memorialized on the record entitled Judge Hite to assume, without talking to Judge Van Aken, that there was no such ruling at all.

Even if we were to conclude that Judge Hite and Judge Van Aken's communications were somehow improper—which again we do not—Hampton fails to demonstrate that they violated his constitutional rights. (See *People v. Thompson* (2016) 1 Cal.5th 1043, 1100 ["no case authority holds that a violation of a judicial ethical rule, per se, automatically requires reversal of the ensuing judgment"].) Hampton states in passing that his constitutional right to be present was violated, but he does not attempt to show that his absence during the two judges' discussion was prejudicial. (See *id.* at p. 1098.) Likewise, he briefly argues that the fact the discussion was not on the record "deprived [him] of his due process right to a complete and

16

adequate record on appeal," but he does not address the issue of prejudice in that regard either. Rather, the focus of Hampton's claim is that the judges' communications violated his right to be "represented by counsel at all critical proceedings," which he claims is "per se reversible" under *United States v. Cronic* (1984) 466 U.S. 648 (*Cronic*).

A criminal defendant is entitled to the effective assistance of counsel under the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *In re Long* (2020) 10 Cal.5th 764, 773.) Although reversal based on deprivation of this right usually requires a showing of prejudice, " '*Cronic* recognized a narrow exception to' [this] rule." (*People v. Rices* (2017) 4 Cal.5th 49, 91.) *Cronic* explained that "the right to effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. . . . There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." (*Cronic*, *supra*, 466 U.S. at p. 658.) One such circumstance is "if the accused is denied counsel at a critical stage of [the] trial," because "counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." (*Id*. at p. 659 & fn. 25.)

Hampton argues that his "mistrial motion occurred at a 'critical stage of the proceedings,' " but he fails to show that his trial counsel was completely absent or prevented from assisting him at that stage. To the contrary, defense counsel vigorously advocated for a mistrial. Moreover, Judge Hite disclosed his communications with Judge Van Aken, and defense

17

counsel was allowed to respond, including by making a record of her own recollection of the previous discussions about remote deliberations. Hampton now claims that defense counsel's absence from the judges' consultation prevented her from ensuring that it was based on accurate information, but even if true this hardly amounted to a complete denial of counsel for purposes of the mistrial motion.

Having failed to demonstrate that prejudice should be presumed under *Cronic*, Hampton does not attempt to show that prejudice resulted from the judges' communications. Even if those communications had not occurred, it is hardly apparent that Judge Hite would have accepted defense counsel's claim that Judge Van Aken ruled that remote deliberations would not occur under any circumstances. Nor did any prejudice result from the remote deliberations themselves. As the record makes clear, the jury reached the guilty verdicts while Juror No. 6 was still deliberating in person. Indeed, the only material event that happened during the remote deliberations was that the jury could not agree on the lesser weapon enhancements, resulting in dismissal of those allegations. In short, Hampton is not entitled to relief based on Judge Hite's reliance on his communications with Judge Van Aken to deny a mistrial.

B.     *Any Error in Permitting Remote Deliberations Was Harmless.*

Hampton also claims that remote deliberations were unauthorized by state law and unconstitutional. We need not resolve this claim because even if there were any error, the error was harmless.

In April 2020, acting under the Governor's authorization, the Judicial Council adopted emergency rules in response to the COVID-19 pandemic. (*E.P. v. Superior Court* (2020) 59 Cal.App.5th 52, 54–55.) California Rules of Court, Appendix I, Emergency rule 3 (Emergency rule 3), which has since

18

"sunsetted" but was in effect during the trial here, addressed the use of technology for remote appearances. (*E.P.*, at p. 55; Emergency rule 3(a), (b).) The rule authorized courts, "in order to protect the health and safety of the public," to "require that criminal proceedings and court operations be conducted remotely." (Emergency rule 3(a).) The rule provided that "[c]onducting criminal proceedings remotely includes, but is not limited to, the use of video, audio, and telephonic means for remote appearances; the electronic exchange and authentication of documentary evidence; e-filing and e-service; the use of remote interpreting; and the use of remote reporting and electronic recording to make the official record of an action or proceeding." (Emergency rule 3(a)(3).)

Hampton contends that jury deliberations are not the type of "proceedings" encompassed by Emergency rule 3. He also claims that the remote deliberations violated his state and federal constitutional rights to a fair and impartial jury and, because Juror No. 6 did not deliver the verdict in person, to be convicted only upon a unanimous verdict of 12 jurors. But he does not argue that the remote deliberations were prejudicial.[5] Instead, he rests on the trial court's statement in denying his motion for a new trial that it agreed with him that "if it was error to require Juror [No.] 6 to participate virtually in deliberations, that error was structural and requires a new trial." Therefore, we need address Hampton's claims only to the extent they allege structural error.

---

[5] For the first time in his reply brief, Hampton claims that prejudice is shown because "by deciding late in the day to permit remote deliberations, the [trial] court deprived [him] of his right to argue to the jury how it might consider the evidence in light of remote deliberations, or object when earlier jurors were summarily excused . . . and not permitted to deliberate remotely." Since he did not make this argument in his opening brief, we do not consider it. (See *People v. Wilson* (2023) 14 Cal.5th 839, 872, fn. 11.)

19

In his appellate briefing, Hampton does not make clear which of the claimed constitutional violations are structural. Rather than making his constitutional arguments anew, he summarizes them as made in his motion for a new trial. We therefore refer to that motion to discern the basis for his claim of structural error.

In the motion, Hampton argued that permitting remote deliberations was structural error because it affected " 'the framework within which the trial proceed[ed], rather than simply [constituting] an error in the trial process itself.' " (Quoting *Arizona v. Fulminante* (1991) 499 U.S. 279, 310 (*Fulminante*).) He then argued that 12 jurors did not actually find him guilty, because the jury did not engage in "a deliberative process that comports with what our framers envisioned" and only "11 jurors . . . marched into court to pronounce" that they had reached unanimous verdicts. He specifically relied on *People v. Traugott* (2010) 184 Cal.App.4th 492 (*Traugott*), in which the Fourth District Court of Appeal reversed for structural error where only 11 jurors returned to the courtroom to render the verdict. (*Id.* at pp. 495, 505.)

Hampton fails to convince us that Juror No. 6's one-day remote deliberation, after the jury had already reached its guilty verdicts while deliberating in person, constitutes structural error. The United States Supreme Court has explained that many structural errors, such as total deprivation of the right to counsel, deprivation of the right to self-representation, or deprivation of the right to a public trial, "defy analysis by 'harmless-error' standards" because they affect "[t]he entire conduct of the trial from beginning to end." (*Fulminante*, *supra*, 499 U.S. at pp. 309–310.) Structural error also occurs when "there has been no jury verdict within the meaning of the Sixth Amendment," such as where the jury was not properly

20

instructed on reasonable doubt or, as in *Traugott*, where the unanimous verdict of 12 jurors was not delivered. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277–278, 280; *Traugott*, *supra*, 184 Cal.App.4th at p. 505.) Either way, it is impossible to determine "what effect the constitutional error . . . had upon the guilty verdict in the case at hand" (*Sullivan*, at p. 279), whether because the error's effect cannot be separately discerned or because there is no valid guilty verdict at all.

Without deciding whether remote deliberations can ever constitute structural error, we have no trouble concluding that the ones here did not alter "[t]he entire conduct of the trial." (*Fulminante*, *supra*, 499 U.S. at pp. 309–310.) Rather, because we know the jury reached its guilty and not guilty verdicts while all the jurors were still deliberating in person, the effect of the remote deliberations on the verdicts can be readily ascertained: There was none.[6]

Nor did Juror No. 6's remote appearance when the verdicts were returned deprive Hampton of his right to a unanimous, 12-juror verdict. Although Juror No. 6 was not physically present in the courtroom, he was available to, and did, affirm that he concurred in the verdicts. Thus, this case is distinguishable from *Traugott*, where one of the jurors was not present at all. Whereas "the court and counsel cannot be confident that the verdict is unanimous" if one of the jurors is unavailable to be polled, here there is no question that all 12 jurors agreed on the verdicts. (*People v. Anzalone* (2013)

---

[6] Judge Van Aken was careful to note that her holding that Hampton was not denied his right to a jury trial did not rest on the jury foreperson's statement that the jury reached the verdicts while it was deliberating in person. Rather, she relied on the presumption that the jurors followed Judge Hite's instructions about deliberating remotely. On appeal, however, Hampton does not object to our consideration of the foreperson's statement.

21

56 Cal.4th 545, 552, 560 [discussing *Traugott*].)  Indeed, Hampton does not claim that the jury was improperly instructed on the need for unanimity or that it might have disregarded that requirement.  (See *id.* at p. 557.)  Absent any indication that the verdicts were not agreed upon by all 12 jurors after in-person deliberations, we cannot conclude that Juror No. 6's virtual presence on the last day of deliberations and while the verdicts were returned amounted to structural error.

III.
DISPOSITION

The judgment is affirmed.

_____

Humes, P.J.



WE CONCUR:




_____

Margulies, J.




_____

Getty, J.*






*Judge of the Superior Court of the County of Solano, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*People v. Hampton*  A165957


23

Trial Court: San Francisco City and County Superior Court

Trial Judge: Christine Van Aken

Counsel:

Lillian Hamrick, under appointment by the Court of Appeal, for Defendant and Appellant.


Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Melissa A. Meth and Julia Y. Je, Deputy Attorneys General for Plaintiff and Respondent.

*People v. Hampton*  A165957