Filed 4/29/25  P. v. Pec CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063158 |
| v. | (Super. Ct. No. 18CF0058) |
| ROSENDO XO PEC, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Patrick H. Donahue, Judge. Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Rosendo Xo Pec of first degree murder of an elderly transient woman, Willis, and found true the special allegation that he committed the murder while attempting to rape her. During the trial, the jury heard the recorded police interviews of Pec and Pec's recorded jail calls. Pec made many incriminating statements in these recordings, including admitting to attempting to rape Willis and admitting to killing someone. He admitted to hitting and strangling Willis. All of Pec's extrajudicial statements the jury heard were recorded.

Dr. Yong-Son Kim, the forensic pathologist who performed Willis's autopsy, testified her cause of death was sequelae of head and neck trauma. The pathologist also noted other significant natural findings that, had they not been there, Willis may have lived.

The trial court included in its jury instructions, the bracketed portion of CALCRIM No. 358, which states, "Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded." Pec's trial counsel did not object to this instruction. Pec appeals the judgment, alleging this was prejudicial instructional error because it effectively instructed the jury that it should believe Pec's recorded confession about killing somebody, when other evidence shows Willis died from natural causes. Pec contends that if we find his trial counsel waived the issue, then he received ineffective assistance of counsel.

We need not address the issues of forfeiture, instructional error, or Pec's trial counsel's performance, because we conclude any error was harmless. We affirm.

2

FACTS

An information charged Pec with Willis's murder and alleged the special circumstances that the murder was committed during the commission of attempted rape.

## I.

### THE CRIME SCENE

In the early morning hours of January 1, 2018, a witness called the police because she heard someone screaming, "'[H]elp,'" and "'[N]o, please,'" and what sounded like a scuffle in a parking lot adjacent to her backyard.

Police officers arrived and found the body of Willis, a transient woman in her 70's. The body was on the ground, next to a make-shift transient encampment with blankets. There was blood in and around Willis's ear.

When a police officer shined a spotlight on the area, he witnessed Pec rise from where Willis's body was laying. Pec's pants were unbuttoned and partially down, exposing his buttocks. Pec moved quickly behind a cement pillar and attempted to jump over the shopping center wall before police detained him.

Willis's daughter went to the scene the same day with a police detective and the coroner. She identified Willis and gathered Willis's belongings from her shopping cart. While going through her belongings, her daughter found a jacket that she did not recognize as Willis's. There was a cell phone in the jacket pocket with a picture of Pec as the phone's wallpaper.

## PEC'S RECORDED STATEMENTS

Later that day, police officers interviewed Pec twice—first for 45 minutes and then for 16 minutes. Both interviews were recorded and played for the jury at Pec's trial.

Pec described a jacket he left at the scene with his phone in the pocket, which was consistent with the jacket and phone the police recovered from the scene. Pec also initialed a photo of Willis's body to confirm that was the person he encountered at the crime scene.

Pec said he was trying to rob Willis, but she woke up screaming. He accidentally fell on top of her while she was lying on the ground. He said he took the blanket off of Willis and had bad thoughts when he saw she was nude. Pec admitted he pulled his zipper down and was touching himself to try to get an erection. He admitted he grabbed Willis's vagina and intended to rape her.[1] When he grabbed Willis's vagina, she was struggling, resisting, saying, "[N]o," and calling for help.

Pec stated he accidentally hit Willis with his elbow when he fell on top of her. He admitted to hitting her once with a closed fist to keep Willis quiet. He later stated he hit her twice, grabbed her by the side of her neck, and squeezed her neck.

Pec never confessed to the police that he killed Willis. But the jury also heard two recorded jail phone calls Pec made to a friend. In the calls, Pec said he was incarcerated because he tried to rob someone and killed him. He said, "I ki-killed somebody. I'm here with the police and they're going

---

[1] The parties stipulated that Willis's DNA was found on Pec's penis.

to put me in jail. [¶] . . . [¶] . . . I was walking by myself, but . . . they sent me to the dude to, uh, kill someone . . . also to, to rob something . . . . [¶] . . . [¶] . . . I killed him. A robbery and well, he died."

## III.

### FORENSIC EVIDENCE

Kim, the forensic pathologist who performed Willis's autopsy, listed her cause of death as sequelae of head and neck trauma. Kim also listed coronary artery disease, brain atrophy, mitral valve calcification as other natural causes on Willis's death certificate.

Kim testified Willis had "trauma around the head and neck areas that, . . . by themselves could be consistent with [her] death or at least could have triggered [her] death. And in addition to that, [she] had significant natural findings that, if they had not been there, [she] would probably had a chance to possibly survive. [¶] On the other side, because of the presence of the trauma . . . in addition to her natural disease . . . I designated the cause of death as I listed," the sequelae of head and neck trauma.

## IV.

### JURY INSTRUCTIONS

After the close of evidence, the parties met with the trial court off the record to discuss which jury instructions to include. Then they memorialized the discussion and relevant objections on the record. The record showed that Pec's trial counsel objected to three of the proposed jury instructions but did not object to the inclusion of the bracketed portion of CALCRIM No. 358. Accordingly, the court instructed the jury on CALCRIM No. 358 as follows: "You have heard evidence that the defendant made oral and written statements before the trial. You must decide whether the defendant made any of these statements, in whole or in part. If you decide

5

that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statements. [¶] [*Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded.*]" (Italics added.)

The jury convicted Pec of first degree murder and found true the special circumstance allegation that Pec committed the murder during the attempted commission of rape. Pec timely appealed.

DISCUSSION

Pec alleges the trial court prejudicially erred when it included the bracketed portion of CALCRIM No. 358. He argues that we can still review this issue on appeal, despite his trial counsel's failure to object below, but, if we find the issue is forfeited, then Pec asserts ineffective assistance of counsel for his trial counsel's failure to preserve the issue.

Both claims of instructional error and ineffective assistance of counsel require Pec to establish prejudice. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1195 [instructional error must be prejudicial to require reversal]; *Strickland v. Washington* (1984) 466 U.S. 668, 691 ["An error by counsel, . . . does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment"].) Assuming arguendo instructional error occurred, we conclude any error was harmless, given the insurmountable evidence of Pec's guilt in this case. Because we conclude there was no prejudice, we need not discuss forfeiture, instructional error, or Pec's trial counsel's performance.

Pec first contends we should find prejudice per se because the instructional error was *structural* since it lowered the prosecution's burden of proof. A structural error, like having a biased judge or being deprived of

criminal defense counsel, requires automatic reversal because it "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309–310.) Pec alternatively argues since his federal constitutional rights were violated, we should apply the harmless error test set forth in *Chapman v. California* (1967) 386 U.S. 18, which requires reversal unless the prosecution shows beyond a reasonable doubt the error was harmless.

Both standards are premised on Pec's conclusory contention that the instructional error lowered the prosecution's burden of proof, violating Pec's federal constitutional right to a fair trial and presumption of innocence. But any presumed error presents no such constitutional infirmity, as discussed below. Thus, we apply the *Watson* test, where the error is deemed harmless unless it is reasonably probable the jury would have reached a more favorable result absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) A reasonable probability "does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (C*ollege Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)

Pec argues the bracketed portion of CALCRIM No. 358 essentially instructed the jurors to accept Pec's extrajudicial statements as true. But the purpose of the bracketed portion of CALCRIM No. 358 is not to instruct the jury on the *veracity* of the defendant's statement. The purpose is "to aid the jury in evaluating whether the defendant actually made the statement." (*People v. Diaz, supra*, 60 Cal.4th at p. 1184.) Our Supreme Court noted that testimony about a defendant's extrajudicial admission can be "'dangerous, first, because it may be misapprehended by the person who hears it; secondly, it may not be well remembered; [and] thirdly, it may not be correctly repeated.' [Citation.] Even witnesses with the best intentions

7

often cannot report the "'exact language'" used by a defendant, and therefore may convey, through errors and omissions, an inaccurate impression of a defendant's statements." (*Id*. at p. 1185.) The bracketed, cautionary part of CALCRIM No. 358 serves to prevent inaccurate recitations from carrying too much weight. It "'is designed to aid the jury in determining whether an admission or confession was in fact made.' [Citation.]" (*Diaz*, at p. 1185.)

This follows, because immediately preceding the bracketed portion, CALCRIM No. 358 reads: "You must decide whether the defendant made any of these statements, in whole or in part. If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statements." When the bracketed portion is read in concert with the main instruction, it is clear the bracketed portion does *not* instruct the jury to lend more weight and credibility to the content of the defendant's recorded statements, as Pec suggests. That conclusion is directly in conflict with the main portion of CALCRIM No. 358. The bracketed portion merely addresses the danger of a witness's potential error in reciting a defendant's extrajudicial statement.

As applied here, we assume it was error to include the instruction because all of Pec's extrajudicial statements were recorded, and it was undisputed that Pec made those statements. But this does not lower the prosecution's burden of proof by implicitly suggesting the jurors accept the *veracity* of Pec's recorded statements, as Pec suggests. Veracity is not at issue in the bracketed portion of CALCRIM No. 358, and therefore, there is no constitutional violation of diminishing the prosecution's burdens. Cautioning the jury about whether unrecorded statements were in fact made does not inversely comment on how the jury should view Pec's recorded statements.

The rest of CALCRIM No. 358 instructs the jury that it is up to them to decide how much weight to give each statement, and to consider the statements along with all other evidence, which includes Kim's testimony about Willis's natural infirmities. It is unreasonable to conclude, as Pec does, that the bracketed portion "[told] the jury, effectively, that it should believe the recorded confession."

The jury likely gave weight to Pec's confession because they believed it, along with the other evidence of Pec's guilt. He admitted to attempting to rape Willis, her DNA was found on his penis, he admitted to punching her twice, elbowing her, and strangling her. While Kim opined the cause of death was the trauma to her neck and head, along with potentially other natural causes, Kim did not opine that the trauma Pec caused did not cause Willis's death. With all this in mind, it is not reasonable to conclude that, if the jury had not been instructed to "[c]onsider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded," it might have reached a more favorable result for Pec.

DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


SANCHEZ, J.